BURK v. JOHNSON et al.

(Circuit Court of Appeals, Eighth Circuit. April 24, 1906.)

No. 2,308.

**1. CANCELLATION OF INSTRUMENTS—FRAUD—MUTUAL MISTAKE.**

Where a bill to rescind a contract assigning territory for the promotion of burial associations under copyrighted by-laws was based on alleged false and fraudulent representations by defendant, the bill could not be sustained by proof of mutual mistake.

[Ed. Note.—For cases in point, see vol. 8. Cent. Dig. Cancellation of Instruments, § 96.]

**2. SAME—EVIDENCE.**

In a suit to rescind a contract assigning rights within certain territory under a copyright of articles of association and by-laws for the organizations of mutual burial associations and to cancel notes and mortgage given therefor, evidence *held* insufficient to sustain a finding that defendant represented that the copyright conferred on any purchaser the exclusive right to organize and operate under the plan disclosed, and that no organization using any of the features of such copyrighted plan would or could be operated without obtaining from defendant the right to do so, and that persons so operating were not subject to insurance laws of the several states.

**3. COPYRIGHTS—EFFECT—RIGHTS OBTAINED.**

The copyright of a pamphlet containing articles of association and by-laws of a mutual burial association did not protect the system, considered merely as a system, so as to confer on the person owning the copyright or his transferees the exclusive right to organize associations under the plan described.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Copyrights, § 37.]

**4. CONTRACTS—RESCISSION—MISREPRESENTATIONS—QUESTION OF LAW.**

Where defendant assigned the right to organize mutual burial associations according to a copyrighted plan throughout several states to complainants for the full term of the copyright, together with all defendant's right, title, and interest thereto within the states named, secured to defendant by such copyright, any opinions expressed by defendant concerning what his rights were under such copyright, in the absence of a misunderstanding of the facts or bad faith, constituted a mere matter of mistake of law, which was insufficient to authorize a cancellation of the contract.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, §§ 427, 1166.]

**5. SAME.**

Where complainants purchased from defendant, who was an ignorant man, the right to use defendant's copyrighted plan for the establishment of mutual burial associations in several states on defendant's alleged misrepresentations concerning his rights under his copyright, and that the plan was not subject to supervision by state insurance departments, and when the matter remained in escrow for two months before the transaction was completed, and complainants had ample time to ascertain their rights under the contract, if they failed to do so, they were not thereafter entitled to demand a rescission because of such misrepresentations.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, §§ 425, 1160–1164.]

146 F.—14

6. SAME—RATIFICATION.

Where complainants, having purchased an assignment of the right to organize and operate mutual burial associations under a copyrighted plan in June, 1902, discovered the falsity of certain alleged representations of the seller concerning complainants' rights under the contract within a month after the contract was made, but continued, notwithstanding, to operate under the contract, and made no demand for rescission until suit was brought to cancel the contract more than a year thereafter, the fraud, if any existed, was waived.

[Ed. Note.—For cases in point, see vol. 11, 'Cent. Dig. Contracts, §§ 446, 1181, 1183.]

7. DEEDS—BLANKS—COMPLETION.

Where the name of the grantee in a deed executed, acknowledged, and deposited in escrow was left blank at the request of the vendee, the fact that he thereafter filled the blank with his own name and recorded the deed did not invalidate it.

[Ed. Note.—For cases in point, see vol. 16, Cent. Dig. Deeds, § 64.]

8. SAME—PAROL AUTHORITY.

Under Gen. St. Kan. 1901, § 1195, providing that a deed to real estate situated in that state need not be under seal, parol authority, express or implied, was sufficient to authorize a vendee to fill his own name in a blank left for that purpose in a deed to land located in that state.

Appeal from the Circuit Court of the United States for the District of Kansas.

This was a suit in equity brought by the appellees against the appellant, Burk, for the rescission of a contract and cancellation of certain instruments made in its execution. Burk was the owner of a copyright on a pamphlet known as "Articles of Association and By-Laws of Harrison Mutual Burial Association." The object of an association formed by the adoption of such articles and by-laws was to provide a plan, by mutual and periodical assessments of members, whereby funeral expenses of each should be secured. The bill charges that Burk induced complainants, W. A. Johnson and Beach, who were copartners under the name of Johnson, Beach & Co., to purchase from him the right to use the copyright throughout certain specified states by false and fraudulent representations made by him, to the effect that the copyright conferred upon any purchaser the exclusive right to organize and operate under the plan disclosed by it; that no organization using any of the features of the copyrighted plan would or could be operated without obtaining from him the right to do so; that persons organizing and operating under his copyrighted articles would not be under the supervision of insurance commissioners of any of the states constituting the territory about which he was negotiating with complainants; and that he would protect them in the exclusive and unembarrassed use of the copyrighted plan in that territory; and further charges that, led on by such false representations, and relying upon their truth, complainants took an assignment from Burk in the following words:

"To All Whom it May Concern: Whereas, I, A. F. Burk, of Harrison, Ohio, did obtain a copyright from the United States for the Harrison Mutual Burial Association, and the certificate of said copyright was dated December 18th, 1899, now this deed witnesseth that for a valuable consideration, viz., ten thousand dollars to me in hand paid, the receipt whereof is hereby acknowledged, I have assigned, sold, and set over, and by these presents do assign, sell, and set over, unto Johnson, Beach & Co., of Wichita, Kan., all the right, title, and interest for and within the following states: Wisconsin, Minnesota, North Dakota, South Dakota, Montana, Idaho, Washington, Oregon, and California, in the said Harrison Mutual Burial Association, as secured to me by said copyright, the same to be held and enjoyed by the said Johnson, Beach & Co. for his own sole use and behoof, and for the sole use and behoof of his legal representatives, to the full end of the term for which said copyright was issued, for and within the limits of the above-described

territory only. as fully and entirely as the same would have been held and enjoyed by me had this assignment and sale not been made.

"In testimony whereof, I have hereunto set my hand and affixed my seal this fourth day of June, 1902.

"[Signed]                                                    A. F. Burk.    [Seal.]"

The bill further charges that, in consideration of the assignment. complainants executed and delivered to Burk their five promissory notes. maturing from time to time during the following year, and also a deed conveying to him title to a valuable lot of ground in Wichita, Kan.; that Burk had no right to convey to complainants, and did not convey to them, any exclusive use of the copyrighted plan; that other associations operating on a similar plan were at the time in operation; and that the operation under the plan was not free from the supervision of the insurance commissioners in the territory acquired by complainants. After issue joined and hearing had a decree was rendered in the Circuit Court canceling the notes and deed. and forever enjoining and restraining Burk from asserting any claim thereunder From that decree he appeals.

Dudley P. Wayne and Sherman T. McPherson, for appellant.

W. E. Stanley and Earl Blake (R. R. Vermilion, Earle W. Evans, and W. A. Ayres, on the brief), for appellees.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The gravamen of the bill is the alleged false and fraudulent representations of defendant, and the decree must be sustained, if at all, upon proof of the specific and definite fraud alleged in the bill. "The rule that the court will only grant such relief as the plaintiff is entitled to upon the case made by the bill is most strictly enforced in those cases where plaintiff relies upon fraud. Accordingly, it has been laid down that where the plaintiff has rested his case in the bill upon imputations of direct personal misrepresentation and fraud, he cannot be permitted to support it upon any other ground." Daniell's Ch. Pl. & Pr. vol. 1, *page 380; Eyre v. Potter, 15 How. 41, 56, 14 L. Ed. 592; Putnam v. Day, 22 Wall. 60, 66, 22 L. Ed. 764; Hendryx v. Perkins, 52 C. C. A. 435, 114 Fed. 801. Attention is called to the foregoing rule because of a claim that the decree below might be supported on proof of a mutual mistake. We do not wish to be understood as intimating that the proof shows such a mistake, but the rule is alluded to for the purpose of sharply defining the issue before us. The questions arising on this appeal will be stated as the opinion progresses.

Did defendant make the false and fraudulent representations as averred, with the actual fraudulent intent and purpose charged in the bill? The proof discloses that complainants had observed the success of one Gill, who had acquired an assignment of defendant's copyright for use in Wichita county, Kan., where he had organized an association of over 8,000 members, had heard of the Burk plan and its advantages through Gill and one Larimer, who was Burk's agent for disposing of territory in the state of Kansas, and had become exceedingly anxious to acquire territorial rights themselves. From April 12 to June 1, 1902, urgent letters were written by Johnson to Burk, advising the latter that he and his associate had concluded to make a

deal with him, and, as they wanted to secure large territory, urged Burk to come to Wichita. Burk at this time was much occupied in handling his copyright and organizing associations under it. He had, before negotiating with Johnson, made between 8,000 and 9,000 sales of territory throughout the United States, and had made them all by assigning his copyright for use within the territory sold, substantially as done by him in this case. Burk finally, on June 4th, was persuaded to go to Wichita to meet Johnson. The parties differ concerning the negotiations which followed. Burk says he expected to have to explain his proposition, and, as he began to do so, Johnson told him he had seen Gill and Larimer, and knew the whole thing, and all he wanted to know was the price and conditions on which he could get the desired territory; that they quickly agreed upon the territory, and the price of $9,000; $2,000 to be paid in notes of complainants, maturing from time to time within the following year, and the balance ($7,000) to be paid by conveying a house and lot in Wichita owned by Johnson. The assignment of the copyright, which was made in the form Burk had always employed, and which was written or filled in by Beach, the notes and the deed were all executed and left in escrow with the president of the Fourth National Bank, to be exchanged when Johnson should have paid a note of about $1,000, secured by mortgage on the lot. Subsequently, deliveries of these notes, assignment, and deed were all made according to the terms of the escrow.

Johnson, the main witness for complainants, testifies as follows:

"That upon learning that Burk was at the hotel, we went up to his room, and said to Burk: 'Now I have got just a few questions to ask you. I am very busy. What have you got, and how can you protect us in this proposition?'"

That the following colloquy then occurred between him and Burk. The latter said:

"'I have got my plan so thoroughly covered with copyrights that I have absolute protection, and can protect you absolutely against all comers and goers. * * * I can absolutely protect you from any one collecting money in a burial association by assessment.' I told him if he had some proposition to offer us that would give the men we sold to absolute protection, so that no one else could infringe or start a plan similar to it, that we could deal; otherwise it would not be any use to say a word. * * * He said: 'I have had that idea copyrighted, and I am protected for seventeen years from the date I am copyrighted.'"

Johnson testifies that these conversations were both before and after the execution of the assignment; that Burk had with him his certificate of copyright, and in course of the negotiation exhibited the same to complainants, and also exhibited the constitution and by-laws copyrighted, and made a good many explanations concerning them.

Mr. Beach, the other complainant, gives his account of the negotiations as follows:

"I said * * * that there were two propositions that I wanted to thoroughly understand. One was, was it strictly a legitimate proposition? And the other was, was he able to protect us by copyright in the proposition?"

He testifies that Burk answered in the affirmative, and further stated that the plan did not conflict with the insurance laws of any of the states. Burk flatly denies the testimony of both Johnson and Beach.

From this kind of testimony, in the light of many other incontrovertible facts, we are unable to find that Burk made the representations ascribed to him by complainants in any such sense as is claimed by them, or in any sense that afforded complainants any ground for reliance upon them in the deal they were engaged in making.

Complainants, after the transaction was closed and after they had entered upon the business contemplated by it, wrote some letters which are in evidence. In those letters they referred to the existence of similar associations which they found they had to compete with, and referred to the fact that they were required to conform to the insurance laws of the state of Minnesota before commencing business there. If the representations claimed to have been made by Burk had been made, and if complainants had been induced by them to make the negotiation in question, nothing would have been more natural than an immediate and vigorous protest upon first ascertaining that the representations were untrue; but, as will be later seen, there were no such protests. Moreover, complainants seem, according to their own testimony, to have been fully advised as to the nature and character of the business from conversations with Larimer and Gill, who had been successfully operating the same kind of a business in the state of Kansas, and particularly in the county of Wichita. They seem, from the correspondence anterior to Burk's going to Wichita, to have made up their minds to go into the business provided they could get territory from Burk. Their anxiety to secure this territory was great and Burk's disposition indifferent. All these things harmonize better with Burk's theory than with complainants'. We have no doubt that Burk, like many successful business men, exaggerated the merit of the general scheme of his business. He had organized many associations under his copyrighted articles, and had made a great success of them. He would naturally boast of his success. Whatever may have been his representations, we hesitate to believe, from all the facts and circumstances attending this case, that he deliberately, fraudulently, and deceitfully undertook to assure complainants that his copyright, for the partial assignment of which he was then negotiating, would secure to them the exclusive use of the plan of operation suggested by it. His copyright conferred upon him no such exclusive right. Baker v. Selden, 101 U. S. 99, 25 L. Ed. 841; Griggs v. Perrin (C. C.) 49 Fed. 15. This he and complainants were both presumed to know, and any representation to the contrary or reliance upon it would be unreasonable and improbable.

But, in deference to the contrary contention, we are led to some other considerations. The representations relied on in the bill relate to the scope and effect of the copyright, or, rather, to what advantages or immunities the law conferred upon its owner. Bearing in mind that during the negotiations in question the parties had before them, free to the observation and inspection of all, the certificate of copyright

and the printed copy of the constitution and by-laws copyrighted, and bearing in mind, also, that Beach, one of the complainants, drafted the assignment for Burk to execute, and thus became critically familiar with the language employed and all its limitations, it seems that there was no opportunity for misunderstanding the facts, or no actual misrepresentation or suppression of any of them. Reference to the assignment in question discloses that Burk intended to convey and complainants to ·acquire the right to exploit the copyright throughout the states of Wisconsin, Minnesota, North Dakota, South Dakota, Montana, Idaho, Washington, Oregon, and California, and this right only. Language cannot be plainer than that employed by the parties to this contract. The assignor, after reciting that he, on a date mentioned, had secured a copyright for the Harrison Mutual Burial Association, says that he has assigned to Johnson, Beach & Co. "all right, title, and interest for and within" the states named "in the said Harrison Mutual Burial Association as secured to him by said copyright; the same to be held and enjoyed by the said Johnson, Beach & Co. * * * to the full end of the term for which said copyright was issued, * * * as fully and entirely as the same would have been held and enjoyed by him had this assignment and sale not been made." Such was their contract—a clear and explicit assignment of such rights, and only such rights, as were conferred by the copyright. Any opinions expressed concerning what those rights were are opinions concerning the law, and, in the absence of any misunderstanding of the facts or bad faith, do not afford the basis of an action for deceit or for rescission of the contract.

The Supreme Court of the United States in Upton v. Tribilcock, 91 U. S. 45, 50, 23 L. Ed. 203, says:

"That a misrepresentation or misunderstanding of the law will not vitiate a contract where there is no misunderstanding of the facts is well settled."

Then, adopting the language of Fish v. Cleland, 33 Ill. 243, the court says:

"A representation of what the law will or will not permit to be done is one on which the party to whom it is made has no right to rely; and if he does so it is his folly, and he cannot ask the law to relieve him from the consequences. The truth or falsehood of such a representation can be tested by ordinary vigilance and attention. It is an opinion in regard to the law, and is always understood as such."

—Citing Starr v. Bennett, 5 Hill (N. Y.) 303; Lewis v. Jones, 4 B. & C. 506; Rashall v. Ford, Law Rep. 2 Eq. 750. In the same case the learned justice uses the following language: "The rule that a mistake of law does not avail prevails in equity as well as at common law"—citing Bank of U. S. v. Daniel, 12 Pet. 32, 9 L. Ed. 989; Hunt v. Rousmanier, 1 Pet. 1, 7 L. Ed. 27; Id., 8 Wheat. 174, 5 L. Ed. 589; Mellish v. Robertson, 25 Vt. 603. See, also, Travelers' Ins. Co. v. Henderson, 16 C. C. A. 390, 69 Fed. 762, and Patent Title Co. v. Stratton (C. C.) 89 Fed. 174.

We are aware that the rule just alluded to is not an inflexible one; it has been departed from in exceptional cases.

In Griswold v. Hazard, 141 U. S. 260, 284, 11 Sup. Ct. 972, 999,

35 L. Ed. 678, these exceptions are considered. After affirming the general rule just adverted to, the court says:

"Yet the rule that an admitted or clearly established misapprehension of the law does create a basis for the interference of courts of equity, resting on discretion and to be exercised only in the most unquestionable and flagrant cases, is certainly more in consonance with the best considered and best reasoned cases upon this point, both English and American."

In the light of what has already been said concerning the facts of this case, we cannot place it among the exceptions. The Griswold Case was based, in part, at least, upon an alleged mutual mistake of the parties. In that respect, also, it affords no parallelism to the case before us.

Another well-recognized rule precludes recovery by complainants in this case. It was not reasonable prudence on their part to act upon the opinion of Burk concerning their legal rights under the assignment which they took. Burk, as disclosed by his letters and testimony, was an ignorant man. He was not a lawyer, and did not pretend to be versed in the law. He was interested adversely to complainants. There existed no occasion for immediate or hasty action. The papers involved in the transaction were left by Burk in Wichita for about two months in escrow before the transaction was closed by their interchange. Burk left Wichita immediately upon their execution and delivery in escrow. Complainants, who resided there, remained there. Ample time was afforded for consultation and information concerning their rights. No lawyers were consulted concerning them, and no other information apparently desired or secured.

In Slaughter's Administrator v. Gerson, 13 Wall. 379, 20 L. Ed. 627, the Supreme Court, by Mr. Justice Field, laid down the governing principles on this subject. He says:

"The misrepresentation which will vitiate a contract of sale, and prevent a court of equity from aiding its enforcement, must * * * relate to a matter respecting which the complaining party did not possess at hand the means of knowledge. * * * A court of equity will not undertake, any more than a court of law, to relieve a party from the consequences of his own inattention and carelessness. Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's misrepresentations. If, having eyes, he will not see matters directly before them where no concealment is made or attempted. he will not be entitled to favorable consideration when he complains that he has suffered from his own voluntary blindness, and been misled by over-confidence in the statements of another."

In Farnsworth v. Duffner, 142 U. S. 43, 12 Sup. Ct. 164, 35 L. Ed. 931, the Supreme Court, speaking by Mr. Justice Brewer, after referring with approval to the Slaughter Case, quotes from Atwood v. Small, decided by the House of Lords, and reported in 6 Cl. & Finn. 232, 233, as follows:

"If a purchaser, choosing to judge for himself, does not avail himself of the knowledge or means of knowledge open to him or to his agents, he can not be heard to say he was deceived by the vendor's representations."

In Clark v. Reeder, 158 U. S. 505, 524, 15 Sup. Ct. 849, 39 L. Ed. 1070, referring to Farnsworth v. Duffner, the court says:

"In respect to such an action, it has been laid down by many authorities that, where means of knowledge respecting the matters falsely represented are equally open to purchaser and vendor, the former is charged with knowledge of all that by the use of such means he could have ascertained."

See, to the same effect, 2 Pom. Eq. Jur. § 892; Southern Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678, and Upton v. Tribilcock, supra, wherein it is said:

"Equity will not assist a man whose condition is attributable only to that want of diligence which may be fairly expected from a reasonable person."

The means of knowledge as to what Burk conveyed by the assignment of the copyright were as available to the complainants as to the defendant. It was a question of law pure and simple, and whether the plan of operation suggested by the copyright was one that subjected the operators to the provisions of the insurance laws of any state was also a question of law. Complainants had ample opportunity to submit these legal questions to competent counsel, and ample time within which to do it before their situation was at all changed. Their reliance upon what Burk said, under such circumstances, was not the act of a prudent person. It did not evince ordinary discretion or diligence, and does not justify their resort to a court of equity to right; the same to be held and enjoyed by the said Johnson, Beach relieve them against his alleged misrepresentations.

If the representations were material, and were made as charged in the bill, did not the complainants, on learning their falsity, elect to ratify the contract notwithstanding?

About August 1, 1902, both Johnson and Beach started into the new enterprise. They first went to Minneapolis, and were forthwith informed by attorneys that their business conducted under the articles and by-laws of the Harrison Mutual Burial Association would subject them to the provisions of the insurance laws of Minnesota. After becoming satisfied that such was the case, they proceeded to incorporate under the laws of Minnesota, and otherwise to conform thereto, so as to qualify them to prosecute business in that state. It also appears that they found two different companies or associations organized in Minneapolis for similar purposes as their own.

On September 19, 1902, complainants wrote Burk a letter, which, after some highly decorous observations against resorting to political influences to further their ends, reads as follows:

"Now don't conclude by this that we have given up the idea of succeeding with this meritorious business, for we have not. But we have got to add some of our own merit and money as well. We have found out by advising with the best legal talent that we will have to conform to the insurance laws of Minnesota to operate here. Now we inclose two ads. of so-called Mutual Burial Ass'n, and copyrighted, too. What are they? People here say, why, if I can get this for $200 what do I want of the Harrison. Will you kindly send us some of their literature, that we may be advised, and know how to meet these unusual and unlooked for propositions."

It is to be observed from the foregoing letter that although complainants, soon after starting out in their venture, were advised of facts clearly showing that the representations which they claim to have

relied on were false, they fail, in the first letter communicating those facts to Burk, to allude to any deception practiced by him, or to any claim of right to cancellation or modification of their contract.

Later, on November 19th, in a letter written by Johnson for his firm to Burk, he states that they had been having "the hardest time of their lives in Minnesota. * * * We fought hard, but all of no avail. I have spent lots of time and money. I expect to do better out west." Still no complaint, but a determination to go on in the prosecution of their business. Beach was left in Minnesota to conduct the business there, and Johnson started westward. He subsequently went to all the principal places in his territory, Butte, Spokane, Seattle, Tacoma, Portland, and some other little towns. He says he had no trouble at Butte, but sold that territory to another. At Spokane he made satisfactory arrangements, and went on to Portland, where he received a letter informing him that a big undertaker at Spokane had organized an association identical with theirs called the Martha Washington, collecting money by assessment for burial purposes. He says he found the Martin brothers, from Illinois, had gone all over their territory, offering to sell it on about the same plan as Burk did. These are things which, on complainants' theory, should have moved Johnson to a most vigorous protest, and which, as will be later seen, demanded immediate action if rescission was contemplated. But such was not the case.

On November 29th, in a letter written from Tacoma, Johnson says to Burk:

"Please write me a good letter, stating how the H. M. B. Asso. is getting along at different places, and if there are any other associations that are doing anything. This will help me in trying to sell this territory. * * * * "

On February 17, 1903, Johnson writes to Burk, informing him that he had just sold two towns for $125, $45 cash and $80 on time. The correspondence shows no complaint until January 15, 1903, when Beach wrote Burk the following letter:

"Mr. W. A. Johnson writes me from Washington that there is a burial association organized at Spokane, Washington, practically the same plan as the Harrison. We request you to look after and ——— it up at once as per your agreement with us."

On February 8, 1903, Beach wrote Burk another letter as follows:

"There is an organization here in Minneapolis called the Friendly Aid Society. Its sole purpose is the burial of its dead, and its workings are practically the same as the Harrison. I inclose some of their literature. Now we demand that you attend to this at once."

These letters, instead of indicating an election to rescind by reason of any representations, plainly recognize the contract as made to be in force. They call upon Burk to perform what complainants say was one of its stipulations. This and other reliable testimony establish the following facts: Complainants secured the right to sell and use the copyrighted articles through an extended territory and with it the advantage of the prestige which a large number of prosperous associations organized under them afforded. After they had received positive information of the existence of conditions different

from those claimed to have been represented by Burk, they took no action to rescind the contract, but proceeded to exercise its privileges, speculate upon its possibilities, and receive and enjoy its fruits. Not a word of complaint concerning defendant's conduct was made for about six months, and then, instead of a notice of a rescission of the contract, a demand for its performance followed. Nothing different is disclosed by the record until the institution of this suit in September, 1903. It was then too late. They had already waived all objections which they could have made by reason of the fraud, and elected to proceed in the execution of their contract notwithstanding it.

In the leading case of Grymes v. Sanders, 93 U. S. 55, 23 L. Ed. 798, the Supreme Court lays down the following rule:

"Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted."

In McLean v. Clapp, 141 U. S. 429, 12 Sup. Ct. 29, 35 L. Ed. 804, the doctrine of the last-mentioned case is repeated and reinforced.

In Scheftel v. Hays, 7 C. C. A. 308, 58 Fed. 457, and in Stuart v. Hayden, 18 C. C. A. 618, 72 Fed. 402, this court has spoken in no uncertain voice on these questions. In the latter case it made use of the following:

"If one who is induced to make a trade or sale by fraud would rescind it, he must immediately, upon his discovery of the fraud, announce his intention so to do, and return all the consideration he has received, to the end that the parties may be put in statu-quo before subsequent transactions have made action impossible. Silence, delay, vacillation, acquiescence, or the retention and use of any of the fruits of the sale or trade that are capable of restoration for any considerable length of time after the discovery of the fraud constitute a complete and irrevocable ratification of the transaction."

See, to the same effect, Pom. Eq. Jur., vol. 2, § 897, and E. Bement & Sons v. La Dow (C. C.) 66 Fed. 185, and cases cited.

Applying the doctrine of the foregoing cases, complainants must be held, under the facts disclosed by this record, to have elected to ratify the contract in question, even if it was procured by false and fraudulent representations.

It is urged in argument that the failure and inability of complainants to restore or offer to restore the consideration received by them or to place the defendant in statu quo is fatal to their right of relief. In the view we have taken of other and controlling issues, we deem it unnecessary to express our opinion as to the application of this principle. The deed executed, acknowledged, and deposited in escrow by Johnson and his wife was for the convenience and at the request of Burk executed in blank, the name of the grantee being omitted, with the agrement made at the time that Burk might thereafter direct what name should be inserted. Presumptively, as the consideration for the assignment of the copyright was payable to Burk, he had a right to fill in his own name. He subsequently did so, and caused the

deed, with the blank so filled, to be duly recorded in the proper record-er's office. Did this avoid the deed? We think not. It carried out the undoubted intention of the parties, and executed the contract as actu-ally made. A deed to real estate situated in the state of Kansas need not be executed under the seal of the grantors (section 1195, Gen. St. 1901), and accordingly the deed in question was not so executed. In such circumstances, whatever may be the rule in cases where the deed must be a specialty, parol authority, express or implied, to fill in a grantee's name after execution by the grantors is sufficient, and when done the deed is good. Mechem on Agency, § 94, and cases cited; Am. and Eng. Ency. of Law, vol. 1, p. 955, and cases cited. Even if the conveyance is by law required to be under seal of the grantor, there is abundant authority and reason for holding that a blank left for the name of grantee may be filled in by the grantee after execution. Drury v. Foster, 2 Wall. 24, 33, 17 L. Ed. 780; Field v. Stagg, 52 Mo. 534, 14 Am. Rep. 435; Thummel v. Holden, 149 Mo. 677, 51 S. W. 404; State of Minnesota v. Young, 23 Minn. 551; Lafferty v. Lafferty, 42 W. Va. 783, 26 S. E. 262, and cases cited. In any view, the course of procedure adopted by the parties to this suit with reference to filling in the name of the grantee did not vitiate the deed.

We think the learned trial judge erred in the application of the law to the established facts of this case, and for that reason we are con-strained to reverse the decree rendered, and direct the Circuit Court to enter a decree dismissing the bill; and it is so ordered.