COCHRANE v. GARVAN, Alien Property Custodian, et al.

(District Court, E. D. New York. February 26, 1920.)

1. SALES ⬦⇒35—IMPROVIDENCE NOT GROUND FOR RELIEF FROM TRANSFER.

A voluntary transfer of property, however improvident or ill-advised, and even though induced by bad advice, cannot be set aside by a court of equity, in the absence of proof of fraud.

2. SALES ⬦⇒52(7)—INSUFFICIENT PROOF OF FRAUD.

Evidence *held* not to sustain allegations of complainant that she was induced to transfer property by fraudulent misrepresentations made by her attorney.

In Equity. Suit by Mary J. Cochrane against Francis P. Garvan, Alien Property Custodian, and others. Decree for defendants.

Hervey, Barber & McKee, of New York City (I. R. Oeland and A. W. Barber, both of New York City, of counsel), for plaintiff.

Leventritt, Cook, Nathan & Lehman, of New York City (Harry L. Sherman and Harold Nathan, both of New York City, of counsel), for defendant Elizabeth C. Seaman.

Spier Whitaker, of Washington, D. C., and Harland B. Tibbetts, of New York City, for defendant Alien Property Custodian.

GARVIN, District Judge. This action is brought under section 9 of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½c), which provides as follows:

"That any person, not an enemy, or ally of enemy, claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian hereunder, and held by him or by the Treasurer of the United States, or to whom any debt may be owing from an enemy, or ally of enemy, whose property or any part thereof shall have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian hereunder, and held by him or by the Treasurer of the United States, may file with the Custodian a notice of his claim under oath and in such form and containing such particulars as the said custodian shall require; and the President, if application is made therefor by the claimant, may, with the assent of the owner of said property and of all persons claiming any right, title, or interest therein, order the payment, conveyance, transfer, assignment or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States or of the interest therein to which the President shall determine the claimant is entitled: Provided, that no such order by the President shall bar any person from the prosecution of any suit at law or in equity against the claimant to establish any right, title or interest which he may have in such money or other property. If the President shall not so order within sixty days after the filing of such application, or if the claimant shall have filed the notice as above required and shall have made no application to the President, said claimant may, at any time before the expiration of six months after the end of the war, institute a suit in equity in the District Court of the United States for the district in which such claimant resides, or, if a corporation, where it has its principal place of business (to which suit the Alien Property Custodian or the Treasurer of the United States, as the case may be, shall be made a party defendant), to establish the interest, right, title, or debt so claimed, and if suit shall be so instituted then the money or other property of the enemy, or ally of enemy, against whom such interest, right, or title is asserted, or debt claimed, shall be retained in the custody of the

⬦⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Alien Property Custodian, or in the Treasury of the United States, as provided in this act, and until final judgment or decree which shall be entered in favor of the claimant shall be fully satisfied by payment or conveyance, transfer, assignment, or delivery by the defendant or by the Alien Property Custodian or Treasurer of the United States on order of the court, or until final judgment or decree shall be entered against the claimant, or suit otherwise terminated.

"Except as herein provided, the money or other property conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian shall not be liable to lien, attachment, garnishment, trustee process, or execution, or subject to any order or decree of any court.

"This section shall not apply, however, to money paid to the Alien Property Custodian under section 10 hereof."

The plaintiff transferred to the defendant Bondy on January 16, 1915, a voting trust certificate for 490 shares of the Steel Barrel Company of America, Incorporated, and the rights thereunder, reserving to herself a life interest therein, and has brought this action to set aside the transfer, claiming that it was procured from her by fraud and misrepresentation on the part of Harold Nathan, an attorney. The suit was originally brought against A. Mitchell Palmer, then Alien Property Custodian, Oscar Bondy (an alien enemy), the Steel Barrel Company of America, Incorporated, and Samuel Black and Horace A. Demarest, as trustees. Thereafter Francis P. Garvan became Alien Property Custodian and was substituted for Palmer as a party defendant. Bondy has not appeared, and neither the Steel Barrel Company of America, Incorporated, Black, nor Demarest has taken any part in the trial, being apparently without interest in its outcome. Elizabeth C. Seaman, a daughter of the plaintiff claiming an interest in the subject-matter of the controversy, has been permitted to intervene, as a party defendant, by order of the court.

At the beginning of the trial, the Alien Property Custodian questioned the jurisdiction of the court, contending that before an action could be brought against him under section 9 of the Trading with the Enemy Act, the stock must have been transferred to his name. The jurisdiction of the court is now conceded, or at least not disputed, by the Alien Property Custodian. Two questions are presented for determination. First. Is plaintiff entitled to have the transfer set aside?

Second. If the plaintiff has failed to establish her claim, what, if any, interest has defendant Seaman in the property?

Before proceeding to consider these questions, in the light of the proof adduced, it is appropriate to state that the court is of the opinion that plaintiff's contention that a recovery can be had without proof of fraud is without authority. However unfortunate may be the position of an aged and infirm plaintiff, who had made an improvident or unwise disposition of her property by a transfer thereof, because of poor judgment in accepting and acting upon bad advice, yet if suit is brought to set aside such transfer because of fraudulent misrepresentations upon which it was made, the law is well settled that even if a most distressing condition appears, the court is without power to grant relief in the absence of proof of fraud.

In Dashiell v. Grosvener, 66 Fed. 334, 13 C. C. A. 593, 27 L. R. A. 67, Judge Goff said:

"The charges of fraud have been made either under an entire misconception of the facts or with a recklessness that at least is not commendable, and should not be encouraged by an endeavor on the part of this court to relieve the complainants of the embarrassment caused thereby by holding that they are entitled to a decree founded on some general ground of equity jurisdiction, not especially pleaded, but supposed to be included in the prayer for general relief. While equity will always relieve those who suffer from acts of fraud, it has also always required that those who seek its jurisdiction on that account shall, after having carefully scrutinized the cause of complaint, most clearly formulate the allegations of the same, and then they shall fully prove that which they have so alleged."

The court quoted the following language used in Tillinghast v. Champlin, 4 R. I. 173, 67 Am. Dec. 510:

"In almost all these cases it will be found that the objection to relief was not that the bill did not contain allegations sufficient to afford a basis for the inferior or secondary relief upon which the plaintiff wished to fall back, but that, having mingled with those allegations imputations of personal corruption or actual fraud, he had pointed his bill only to relief upon this higher ground, and must therefore succeed upon that ground or not at all."

See, also, Burk v. Johnson, 146 Fed. 209, 76 C. C. A. 567.

In 1911, while the defendant Seaman controlled the Ironclad Manufacturing Company, of Brooklyn, N. Y., a petition in bankruptcy was filed against it, which was followed by extensive litigation. As a result of the efforts of the defendant Seaman to prevent a total loss, after various preliminaries, the defendant corporation was organized in the fall of 1912 to conduct the business of manufacturing steel barrels at Newark, N. J.; the entire capital stock, except directors' shares, being issued to the plaintiff. This company, the stock of which was nominally owned by plaintiff, was financed by her only to a very limited extent; the conclusion is irresistible that property and funds controlled by defendant Seaman together with her activity and energy made the new company possible, although its later prosperity does not seem to have been due to her connection with its affairs. The proof does not disclose that plaintiff took any real part in its management. In 1914 creditors of the American Steel Barrel Company, another corporation, controlled by defendant Seaman, were threatening proceedings against the Steel Barrel Company of America, Incorporated, because of the transfer of machinery from the factory of the former company to that of the latter. In December of that year negotiations conducted by Mr. Nathan, representing the plaintiff and the Steel Barrel Company of America, Incorporated, resulted in an agreement of settlement by which the Steel Barrel Company of America, Incorporated, assumed various debts and the plaintiff transferred to trustees a certificate representing 98 per cent. of the capital stock of said company (490 shares); the trustees in turn issued to plaintiff a voting trust certificate, providing that these shares be returned to plaintiff upon the termination of the voting trust agreement. Plaintiff now seeks to set aside her assignment to Bondy of said voting trust certificate. It appears that Bondy had substantially aided plaintiff's family in a financial manner; he had known defendant Seaman for many years, and his attitude toward her was very friendly. While apparently he was acquainted with other members of the family, there is nothing to indicate that he would

have extended this assistance, had it not been for a desire to aid that defendant.

There is little direct evidence of what occurred when the transfer was made. The plaintiff testified that she went to Nathan's office January 16, 1915, with her daughter-in-law, Jane H. Cochrane, who was requested by Nathan to remain outside while he talked with plaintiff in his private office; that he told her (plaintiff) to assign the stock to Bondy, in order to save it from the creditors; that she did not understand she was divesting herself of the title, but thought the stock would come back to her.

Mr. Nathan, on the other hand, testified that he had discussed the matter fully with the plaintiff, and that she had said that she wished Bondy to be reimbursed for his advances, and that she desired to transfer the stock to him, having complete confidence that he would see that the stock ultimately went to Mrs. Seaman, which was in accordance with the wishes of the plaintiff.

It is quite true that transactions between attorney and client are closely scrutinized, and that such transactions are often declared void by the courts which between other persons would be held unobjectionable; but it by no means follows that because thereof this assignment must be set aside. If it be conceded that by reason of the relation Nathan has the burden of showing, not only that he used no undue influence, but that he fully advised the plaintiff, and that she benefited as much as she would have, if she had dealt with a stranger, it must be determined whether or not he has sustained this burden. The plaintiff is an aged woman, but displayed throughout the trial an extraordinary keenness of mind. It is unbelievable that she should have doubted the propriety of the assignment and Mr. Nathan's friendship, as she testified, at the time of the assignment, and should have waited until the creditors were paid before taking steps to avoid her action, and yet have totally forgotten it when Mr. Nathan wrote her on March 15, 1918, referring to the transfer. Her letter to him, dated March 20, 1918, saying that she had no recollection of the transaction, does not ring true, in view of her testimony that she had gone to his office in the fall of 1917 to see the very paper involved. The frequency, too, with which she repeated, in substance, "I did it to save it from the creditors," was not impressive, and suggested that, having come to believe that she had actually used them, she had determined to reiterate these words, if she remembered nothing else. It may be noted that, if her contention is correct, she was lending herself to a scheme to put property out of the reach of those entitled to it, an act which does not make her a more believable witness, and which, of itself, abundantly justifies refusing to set aside the transfer. The plaintiff has not come into court with clean hands, if she asserts that the transfer which she now seeks to avoid was made by her in order that creditors might not be able to find property to be applied in payment of their claims.

This litigation has been attended by so much bitterness between the parties, which is not altogether uncommon where members of one family are involved, that the court during the trial, endeavored earnestly to reconcile the conflicting interests and to restore the natural rela-

tion of mother and daughter between plaintiff and defendant Seaman which had ceased to exist. All efforts to that end failed, and the action must be decided on the merits.

Inasmuch as, in addition to the great importance to the parties to the action of the questions involved, most serious charges of professional misconduct have been made and urged against an attorney practicing before this court, charges which not only involve his reputation as a member of the bar, but which go to the very propriety of his being permitted to continue to act as such, the court has given the record and the questions discussed in briefs of counsel most careful and earnest consideration.

In view of all the surrounding circumstances, Nathan's version of what transpired at his office January 16, 1915, is borne out by every probability. Plaintiff's testimony concerning her charge of fraud by means of false representations has no corroboration, is vigorously—indeed, hotly—denied by Nathan, and can be credited only upon the theory that plaintiff was willing to lend herself to a scheme by which property standing in her name could be removed from the possibility of seizure by creditors. The testimony of Nathan is that what was done was with plaintiff's full approval, and pursuant to her wish to discharge a moral obligation to Bondy, secure to her daughter, through him, the ultimate control of the Steel Barrel Company of America, Incorporated, to which she was in all fairness entitled, and at the same time to retain a life interest in the stock, thus assuring her own comfort during the remainder of her life. Such an act is what might be expected from one actuated by a desire to do that which ought to be done, and the co-operation of Nathan with his client was commendable. An attorney who measures up to the highest standards of his profession must not only be learned in jurisprudence, but must be ever alert to encourage and even to urge upon his clients the recognition of moral obligations as well as a compliance with statutes as interpreted by decisions. The lawyer, who knows only the law, and not the principles of righteousness and justice upon which law should be founded, fails to realize that with intellect, but without conscience, he cannot discharge his duty as a member of that profession which peculiarly requires a clear conception of the great fundamental distinction between right and wrong, whenever a moral question is involved.

Mr. Nathan's more recent conduct in this matter has also been the subject of severe criticism by the plaintiff. The suit at bar was preceded by an action in the New York Supreme Court, in which a referee was appointed. As soon as Nathan ascertained that his professional conduct was questioned, he asked leave to appear before the referee and testify, so that there might be no suggestion that his silence meant that he feared or was unwilling to have his version made known. In the pending action, he has at all times maintained that plaintiff's charges were false, and wickedly false. Involving, as they do, his honor, and having been made by the plaintiff, she cannot be heard to complain that he has taken the stand and testified. The suggestion that Nathan was guilty of misconduct in conferring with the Alien Property Custodian is without merit. Indeed, the brief of the latter shows that

anything of the sort was at the government's request, in order that the full facts might be disclosed at the trial. If he had brought suit in Mrs. Seaman's behalf, after acting for the plaintiff, another question might arise; but as the plaintiff has made these charges against him, which he denies with great force, no reason suggests itself to prevent his firm appearing for defendant Seaman and endeavoring thereby to establish what he claims to be the actual facts, particularly as she was represented at the trial by counsel in no way previously connected with the matters involved.

The court is of the opinion that the plaintiff has failed to establish the allegations of her bill of complaint to the extent of proving any fraud. There can be no decree in her favor. There is evidence which tends to establish that defendant Bondy made a valid declaration that he held and would hold the property for the benefit of Mrs. Seaman. He has not appeared, and there is no reason to suppose that he would attempt to repudiate that position.

The proof has established to the satisfaction of the court that defendant Seaman is in equity entitled to the stock involved herein upon the death of the plaintiff, and upon payment of the sums advanced by Bondy to defendant Seaman and of whatever sums have been expended, or for which the Alien Property Custodian has become obligated, in the defense of this action.

A decree in conformity with the views expressed may be presented upon notice.