LORENZO HUPSCH

v.

MARY RESCH.

The evidence which will warrant this court in reforming an instrument in writing, in the correction of an alleged mistake, must establish the existence of the mistake beyond reasonable doubt.

On bill, answer and proofs.

*Messrs. Gerber & Norman,* for the complainant.

*Mr. A. Englebrecht* and *Mr. S. B. Ransom,* for the defendants.

PITNEY, V. C.

This is a bill to reform a deed of conveyance of land. The conveyance was made by the sheriff of Union county to Henofoefa *Hubsch* (since deceased), who was the wife of the complainant, and whose real name was Henofoefa Hupsch, and is dated January 30th, 1878, and was proven February 4th, 1878, before a master. The name of the grantee must have been blank at that time, as neither Mr. nor Mrs. Hupsch was present at the sale, nor had they anything to do with the property previous to about May 1st, 1878. It was sold under foreclosure at the suit of one Ernest Crome, who, by his solicitor, Mr. B. A. Vail, bid it off at the sale, but did not take the deed from the sheriff's office. Subsequently, Crome, through one Winkler, a broker, negotiated a sale of the property either to complainant or to his wife, or to both, and complainant and his wife and Crome met at Mr. Vail's office, in Rahway, to complete the transaction. Mr. Vail was Crome's solicitor in the foreclosure suit, and was not in anywise the counsel for Mr. or Mrs. Hupsch. Crome lived at Jersey City and had not brought his wife with him to Rahway, so that the transaction could not be carried through that day by

42

passing the title through Crome in the ordinary way. It was then suggested by Mr. Vail that he could have the name of the new purchaser inserted in the sheriff's deed, to save the expense and trouble of a conveyance from Crome, and he went himself to Elizabeth and procured from the sheriff the deed in its present shape, and returned with it to his office, where the parties had waited meanwhile. The purchase-money was paid by either the complainant or his wife to Crome, and the deed was delivered and recorded. Complainant and his wife took possession of the premises under the deed, and occupied them, either in person or by tenants, until 1887, when the wife was killed by a passing train at Rahway Junction, near which the property was situated.

The contention of the complainant is, that he should have been joined with his wife as grantee in the deed, and that the failure to .write his name jointly with hers in the instrument was a mistake, and he asks this court to rectify it by reforming the deed in that respect. He says, in support of his equity, that the money paid for the property was his money, or, at least, his and his wife's jointly ; and he swears that he requested Mr. Vail to put his name in the deed with his wife's.

The evidence shows that, on April 29th, 1878, a written contract was drawn up and signed by Crome, by which he agreed to 'sell the property in question to complainant, and on the back of the contract is a receipt signed by Crome for $10 received from complainant on account of the purchase-money. No mention is made of his wife in the document.

On April 30th, complainant, by his individual draft, drew from the Hoboken Savings Bank $457.50, which stood to the credit of *L. & G. Hubsch*, and the bank-book in which the credit was entered was endorsed *Lorenzo and Genorefa Hubsch*, in the handwriting of the clerk of the bank who made it up. Complainant swears that this money belonged to him ; that it was the proceeds of the sale of property which he owned in New York State in his own name, and which he purchased before his marriage with the decedent, and that he used it, with other moneys of his own, to pay for this property. He does not explain why it was deposited in bank in the joint name of him-

·self and his wife, but the bank clerk swears that such was a ·common practice, and that the money was subject to be drawn by either party.

I do not find anything in the evidence to contradict the complainant in his evidence and statement thus far.

He further says, that previous purchases of real estate made by him and his wife were taken in their joint names, and produces two deeds which support his statement in that behalf. But when we come to the transaction itself, the affair is not so clear. Complainant swears that he carried the money to Rahway in his pocket; that when it was proposed that Mr. Vail should go to Elizabeth to have the sheriff's deed made directly to the purchaser from Crome, he told Mr. Vail to have it made to him and his wife. On the contrary, Winkler swears that, at the interview which he had with complainant and his wife, at their house in Weehawken, some days before the delivery of the deed, Mrs. Hupsch insisted on having the deed made in her name alone, and that complainant told him so, and that his wife was dissatisfied because previous purchases had been made in their joint names, and that Hupsch did not object to her demand to have the title in her name alone. Mr. Crome, who was present at the delivery of the deed, swears that Mrs. Hupsch said at that time that, " if it is signed in my name, I give the money for it, and pay for it," and that she took the money from her satchel and paid it to him, and that he delivered the deed to her; and further ·on he repeated what she said in somewhat different language: ·" If I don't get the deed in my name, I don't pay the money."

Complainant further swears, that when Mr. Vail returned with the deed, he (complainant) asked Mr. Vail whose name was in the deed, and that he looked at it and answered:

" Only my wife's name was in it only; it ain't right, I said; there ain't both names in; Senator Vail said that can be done; I can't read English; I do not understand English very well; in 1878 I did not understand English as much as I do now.

"Q. When Senator Vail said to you, when you spoke to him about the names in the deed, that it could be done, what did you understand by the remark?

"*A.* I understand it can be done.

"*Q.* Understood what—that it could be done then or some other time?

"*A.* That I did not know, whether then or some other time."

Mr. Vail's account of the transaction is as follows, after stating the meeting of the parties to carry out the contract and the difficulty arising from the absence of Crome's wife, and the suggestion to have the sheriff's deed made directly to the purchaser, and without stating what instruction he received as to the name to be inserted in it as grantee:

"I then came to Elizabeth, got the deed from the sheriff, and returned with it to Rahway, and found the parties were still waiting for me, and, I think, handed the deed to Crome, who passed it over to Hupsch upon receiving the full amount of the purchase-money of the property in bank bills; I think then Hupsch asked me whose name was in the deed, and I said the property was deeded to his wife; I think he then said that both their names should be in the deed, and asked if I could not put his name in; I said no; I had no right to change the deed, but if they wanted the title changed it could be done at any time by proper conveyances; Hupsch then took the deed; Crome took his money and left; I am not sure that Hupsch did not ask me to have the deed recorded for him; my recollection is that Hupsch passed the money over to me, and I counted it and handed it to Crome; I am quite sure that Hupsch talked the matter over with Crome; that his wife did not understand English at all; if she did, she did not say anything; it was very difficult for me to understand Hupsch himself."

And on cross-examination:

"I do not recollect why the wife's name was put in the deed; it must have been done by the sheriff by my direction; I would not have directed the sheriff to put her name in the deed unless I thought I had been so instructed by the parties; I think that Hupsch took the money out of his pocket and handed it to me; I have no recollection of Mrs. Hupsch taking the money out of her satchel and handing it to her husband before he handed it to me."

This comprises all the evidence of the persons partaking in the transaction, tending to show how and why the deed was made as it was. Of course I place implicit confidence in the evidence of Mr. Vail, but then it is subject to the infirmity that pervades the evidence of all lawyers in full practice when called upon to testify about transactions of that kind taking place

many years ago, of little importance at the time, and not likely, among the multitude of transactions, to fix itself very vividly in the memory; and now it is not surprising we should find there is a sort of inconsistency in it that is somewhat puzzling. I assume that he must have had the wife's name written out to carry with him to Elizabeth. I presume that he would not have trusted to his memory to carry so unusual a name; and if he had written it out he must have got it from her husband, for he held no communication with the wife, and he must have thought she was to be the sole grantee, else he would not have caused the deed to be so prepared. On the other hand, it is plain the husband was not satisfied with the deed as prepared, and that he expressed his dissatisfaction; nor does it appear that Mr. Vail, in reply to this criticism, asserted, in his own defence, that the husband had instructed him to put in the wife's name alone. Certainly it would have been natural for Mr. Vail to so assert, if it had been true. It may be that the husband intended to instruct Mr. Vail to put in both names, and thought he had done so, and that the name of the wife, being unusual, was written down, but her's only, and that in that way, and with the aid of complainant's unfamiliarity with our language, Mr. Vail was misled, and that a mistake actually occurred, as complainant alleges.

Against this, however, is the evidence above alluded to, pointing in a different direction. And then comes the subsequent conduct and declarations of the complainant. He knew the deed was made out in his wife's name alone, and it can hardly be argued that he thought any change was made, or was expected to be made, by Mr. Vail by reason of anything that was said at the time. Two or three years afterwards the husband and wife had occasion to employ a Mr. Grece, an attorney at Jersey City, to eject some tenants from this very property, and he swears that they disputed in his presence about the very matter of the title being in the wife alone.

Then we have the evidence of Mrs. Rumler, and her daughter Mrs. Dore, who swear they applied to Hupsch to rent these premises after his wife's death, and he expressed a desire to do

so, but said he could not because the title had been in his wife, and Mrs. Rumler swears that he said he "put that place in his wife's name because he was older than she." Mrs. Dore swears to substantially the same thing.

The result of all this evidence is, that I am in doubt as to whether or not any mistake actually occurred in giving the instructions for the filling in of the name of the grantee in the deed. My mind is not thoroughly satisfied that there was any mistake. There were some reasons why her name alone should be put in. Complainant admits she had money—several hundred dollars—when he married her, and that it had been held in common, and at the date in question was mostly in bonds of some kind, which, in the event of her death intestate, would go to him, but were probably in her possession or subject to her disposition in her lifetime. It may have been good policy, on this account, for him to humor her in her demand to have the title put in her own name. Be that as it may, he saw fit to rest nine years without taking any steps to rectify the error, if there was one, and until the lips of the other party most interested were closed in death. Under such circumstances I do not think the court ought to presume anything in his favor.

The familiar rule is, that he who asks to have a written instrument reformed, must make out a perfectly clear case, free from doubt.

In *Waldron* v. *Letson, 2 McCart. 126*, Chief-Justice Green (*p. 128*) says: "It is satisfactorily shown by the evidence" &c., and, at *p. 130*: "The evidence renders it certain" &c.

In *Firmstone* v. *De Camp, 2 C. E. Gr. 317*, Chief-Justice Beasley, sitting for the Chancellor, says (*p. 323*): "Nor in coming to this result have I overlooked the well-settled rule of this court, that in a case of this nature the proof must be clear, so as to leave the mind free from all obscurity or doubt. In my opinion the testimony before me, when carefully examined and weighed, leads the mind to this point and demonstration."

Chancellor Runyon, in *Burgin* v. *Giberson, 11 C. E. Gr. 72, 77*, says: "Courts of equity will relieve against mistake, and will correct and reform deeds and instruments of the most sol-

emn character to grant such relief. But when relief is sought from deeds or other writings, the mistake must be clearly proved."

Vice-Chancellor Van Fleet, in *Rowley* v. *Flannelly, 3 Stew. Eq. 612, 614,* says : " When the evidence, in demonstration of mistake, is doubtful or equivocal, or strongly contradicted, so that it is impossible for the mind to reach a strong conviction as to the truth, the court will not change what is written.   *   *   * Until a mistake has been established by such force of proof as leaves no rational doubt of the fact, no change in the writing sought to be reformed is entitled to be called a correction."

And see remarks of Van Dyke, J., in *Durant* v. *Bacot, 2 McCart. 411, 414,* and *1 Story Eq.* §§ *152, 157.*

The language of Professor Pomeroy, in his *Equity Jurisprudence* § *859,* on this subject is :

" The authorities all require that the parol evidence of the mistake and of the alleged modification must be most clear and convincing, in the language of some judges, ' the strongest possible,' or else the mistake must be admitted by the opposite party ; the resulting proof must be established beyond a reasonable doubt. Courts of equity do not grant the high remedy of reformation upon a probability, nor even upon a *mere* preponderance of evidence, but only upon a certainty of the error."

The application of this rule to the case in hand is fatal to complainant's case.

I find my mind not free from doubt as to whether there was a mistake as he alleges, and to be in doubt is to be resolved against him.

I will advise a decree dismissing the bill, with costs.