BISER v. BAUER.

(Circuit Court of Appeals, Sixth Circuit. April 18, 1913. On Petition for Rehearing, June 30, 1913.)

No. 2,273.

1. REFORMATION OF INSTRUMENTS (§ 44*)—PAROL EVIDENCE.

On a bill to reform a written contract, parol evidence is admissible to vary or contradict the writing; but such rule does not deprive the written contract of evidential force.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. §§ 155, 156; Dec. Dig. § 44.*]

2. REFORMATION OF INSTRUMENTS (§ 45*)—EFFECT OF WRITTEN CONTRACT.

Where the environment, the motives of the parties, the consideration, and necessities to be met make a written contract sought to be reformed, a highly improbable one, then the writing has little self-supporting force, and a relatively small amount of clear and credible evidence will be sufficient to authorize reformation; but if the agreement has been put in writing by intelligent business men, acting with opportunity for deliberation, the writing itself stands as evidence of high character, tending to show the real contract, and the attacking party must establish mistake by clear and convincing evidence, a mere preponderance of the testimony being insufficient.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. §§ 157–193; Dec. Dig. § 45.*]

3. CORPORATIONS (§ 116*)—SALE OF STOCK—CONTRACTS—CONSTRUCTION.

Defendant, holding $62,000 par value of the stock of a corporation in which complainant and associates were also interested, in order that necessary additional funds might be raised, executed a written contract with them by which they agreed, in consideration of $30,000 of the corporate stock transferred to them by defendant, to pay him $5,000 in cash, with interest at 5 per cent. per annum after July 1, 1904. Then followed the clause: "In lieu of this" complainant and associates agree to deliver to the corporation any residue that may remain in the sale of the $30,000; it being understood that complainant and associates are to receive no remuneration whatever by such sale, which they agree to transact, the stock to be sold for not less than three for one. Held, that such additional clause was partially unintelligible, and that it should be con-

strued as though it provided that complainant and associates agreed that they would find purchasers of the $30,000 of stock for not less than $10,-000, which sale they agreed to transact, and, after paying defendant $5,000 and interest, pay the residue to the corporation, without deducting any remuneration for their services.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 493, 494, 496; Dec. Dig. § 116.*]

4. REFORMATION OF INSTRUMENTS (§ 45*)—CONTRACTS FOR SALE OF STOCK—MISTAKE—EVIDENCE.

Complainant and associates having executed a written contract obligating themselves to sell $30,000 of the stock of a corporation, to be received from defendant and, after paying defendant $5,000, with interest, to turn over the residue of the proceeds of the sale to the corporation, evidence *held* insufficient to warrant a finding that the contract by mistake did not express the intent of the parties, so as to authorize a reformation thereof, making plaintiff's obligation to pay the $5,000 to defendant conditional on complainant's ability to sell the stock.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. §§ 157–193; Dec. Dig. § 45.*

Reformation of instruments as dependent on mutuality of mistake, see note to American Ass'n v. Williams, 93 C. C. A. 10.]

Appeal from the Circuit Court of the United States for the Western Division of the Southern District of Ohio; John E. Sater, Judge.

Suit by Charles L. Bauer against George W. Biser to reform a written contract for the purchase and sale of corporate stock. Judgment for complainant, and defendant appeals. Reversed and remanded, with instructions.

Biser, the appellant, had acquired and was developing a coal mining property near his residence, Berkeley Springs, in West Virginia. He transferred it to a corporation, the Rock Vein Coal Company, and took, in exchange for the property, the entire $200,000 stock issued out of its authorized capital of $250,000. He then sold $100,000 of this stock to one House for about $12,000 and House's agreement to raise the money necessary to continue the development. House kept his agreement by selling portions of his stock to Bauer and others, who made, or by their indorsement procured, loans to the company, which loans were devoted to development purposes. At an annual meeting, in May, 1904, it appeared that the indebtedness was about $35,000, and that more money was very necessary. Biser then held $62,000 of the stock, and his personal friends $38,000, making one-half of the total; while Messrs. Bauer, House, and their friends held an equal amount. In this situation, Biser was urged to do something to help the company. He was willing to give up $30,000 of his stock to be used for the company's benefit, provided he could realize, in money, $5,000, the amount which he was still owing on his original personal purchase of the mining property. Negotiations along this line led to the signing and delivery of an agreement as follows:

"Berkeley Springs, W. Va., May 2, 1904.

"Witnesseth: We, A. L. House, Chas. L. Weyand, and Chas. L. Bauer, hereinafter known as the parties of the first part, and George W. Biser, hereinafter known as the party of the second part, do and hereby agree that in consideration of thirty thousand ($30,000.00) dollars of Rock Vein Coal Company's stock, transferred by the party of the second part, do and hereby agree to pay said George W. Biser the sum of five thousand ($5,000.00) dollars in cash, with interest at the rate of five per cent. (5%) per annum after July 1, 1904.

"In lieu of this, party of the first part agree to deliver to the Rock Vein Coal Company any residue that may remain in the sale of the $30,000.00.

it being understood that the parties of the first part are to receive no remuneration whatsoever by said sale which they hereby agree to transact, stock not to be sold less than 3 to 1.      A. L. House,

"Signed and sealed.      Charles L. Weyand,

"Chas. L. Bauer,

"Parties of the First Part.

"G. W. Biser,

"Party of the Second Part."

This agreement was followed by correspondence and dealings, which need not be recited in detail, but which resulted in no payment whatever to Biser, and in no sale of the stock by the "parties of the first part." Finally they tendered back to him the certificates of stock. He refused to accept, but brought an action at law, in the United States Circuit Court for the Southern District of Ohio, against Bauer (the only resident one of the "parties of the first part"), based on this agreement, and seeking to recover the stipulated sum of $5,000. Thereupon Bauer filed a bill upon the equity side of the same court, alleging that by mutual mistake the written agreement did not express the real contract, which was only that the "parties of the first part" should take this stock and try to sell it, and, if successful, should pay Biser $5,000 and put the balance in the company treasury. He prayed that the contract be reformed accordingly. On final hearing, the Circuit Court granted the relief, and enjoined the prosecution of the action at law. From this decree, Biser, the defendant therein, appeals.

Westenhaver, Boyd, Rudolph & Brooks, of Cleveland, Ohio, for appellant.

J. E. Bowman, of Springfield, Ohio, for appellee.

Before WARRINGTON and DENISON, Circuit Judges, and McCALL, District Judge.

DENISON, Circuit Judge (after stating the facts as above). It is clear that the vital controversy is whether Bauer and his associates assumed an absolute or a contingent liability. If it was absolute, and if they were bound to see that Biser received the $5,000, the time of payment and just how their liability was to be worked out are of minor importance; if it was contingent, and they were never to be bound to do anything unless a stock purchaser appeared, then, also, many of the matters discussed lose relative importance. The main and controlling question must be: Was Biser right in assuming, after this agreement was made, that he was surely entitled at some time and in some manner to receive $5,000; or is Bauer right in his present assumption that the contract was a mere offer on Biser's part to sell his stock upon the stated terms and for the joint benefit of himself and the company, if a purchaser on such terms could be found? One thing or the other must be the real bargain. There is no room for any middle ground.

[1, 2] Under what rule of law do we approach such a controversy as this? It goes without saying that, upon a bill to reform, parol evidence is admissible to vary or contradict a writing, because to vary and contradict is the essence of reforming; but it does not follow that the writing has no force and should be laid out of view. Its evidential force will vary. If the environment, the motives of the parties, the consideration, and the necessities to be met make the contract, as it is written, a highly improbable one—one for which there was no

motive, or necessity, or consideration—then the writing has little self-supporting force, and a relatively small amount of clear and credible evidence will establish the mistake. Of this type of cases is Griswold v. Hazard, 141 U. S. 260, 11 Sup. Ct. 972, 999, 35 L. Ed. 678. In another and familiar class of cases, the mistake is in describing the property affected; and here, again, the writing may have more or less force as evidence of what the contract was—sometimes very little, because the mistake is sometimes almost apparent.

In a third class of cases, the writing undertakes to formulate an agreement reached by adversary parties after controversial negotiations. It undertakes to say what each one agrees to do. In such a case, and where the bargain is put in writing by intelligent business men, acting with opportunity for deliberation, when one party afterwards' alleges a mistake, in that the writing says he promised, when in fact he did not promise, and in that the writing states the agreement in one way when, in truth, it was the opposite, then the writing itself stands as evidence of high character as tending to show the real contract, and the attacking party must establish the mistake by evidence clear and convincing. The weight of evidence cannot be determined by balancing the oral testimony, because the written, contemporaneous declaration of all the parties must always be in the scale, and will outweigh any mere preponderance of the other testimony. This is the rule of Simmons Creek Coal Co. v. Doran, 142 U. S. 417, 435, 12 Sup. Ct. 239, 35 L. Ed. 1063; Maxwell Land Grant Case, 121 U. S. 325, 381, 7 Sup. Ct. 1015, 30 L. Ed. 949; Lyman v. United Ins. Co., 2 Johns. Ch. (N. Y.) 630, 632; Stockbridge Iron Co. v. Hudson Iron Co.,, 102 Mass. 45, 49; s. c., 107 Mass. 290, 316; Hupsch v. Resch, 45 N. J. Eq. 657, 662, 18 Atl. 372.

In the application of the rule, it cannot be important that the writing is not complete in all its parts—perhaps not even that it is in parts unintelligible—so long as it contains a clear declaration upon the very point which is the controlling point in determining the right to reformation; and this because the writing is to be considered under such conditions, not as a contract, but as evidence.

[3] The contract above quoted is, in some details, incomplete. Every one concedes that the first paragraph is not the whole agreement, and the second paragraph is not only introduced by the confusing phrase "in lieu of," but does not expressly state the whole of its own subject-matter; but there is no difficulty in filling in most of the lacking details, not by way of modifying, but merely by way of reading into its language the situation understood by all. So expanded or explained, the second paragraph will read:

"In lieu of this, the first parties agree that they will find purchasers for this $30,000 of stock for not less than $10,000 [which sale they hereby agree to transact], and, after paying to Biser his $5,000 and interest, will turn over the residue to the company, and without deducting any remuneration for their services."

We cannot doubt that this case is to be considered as if the written contract read as we have just supposed, and, when so redrafted, it is unambiguous in any respect now substantial. It might not be clear

where the voting power was, nor whether the purchasers must account to the company for the excess price on the whole $30,000, or on only $15,000, nor just how long a time they had to make the sale which they "agree to transact"; but it has turned out that these suggested ambiguities are either not important or have been disposed of by subsequent acts of the parties.

[4] The phrase "in lieu of" is not happily chosen, but does not make the contract meaningless. The alternative was (1) that Bauer and associates might buy the stock and own it, and pay Biser therefor, and then, when the stock was sold, pay the surplus to the company; or (2) they might sell the stock under what amounted to an option from Biser, and with the proceeds pay him and the surplus to the company. These would have been vitally different alternatives, implying the right to deny any sure liability, if it had not been for the clause [said sale] "which they hereby agree to transact." Giving this clause its necessary force, the agreement becomes distinct and positive. The first parties will either use their own money and pay Biser his $5,000, and later make sale and account to the company, or they will first make the sale, but upon such terms that it will bring Biser an equivalent $5,000. It would, in the end, make no difference to Biser which course was pursued. There was for him no eventual uncertainty or contingency either way. The first parties would naturally follow the second plan, unless, being delayed too long in making the sale, they wished to close the matter and get rid of Biser; then they would shift to the first plan.

The record contains no definite information as to the genesis of the clause, "which they hereby agree to transact"; but the framework of the writing and the general history of its making up suggest that, having first written an absolute promise to pay, and having then provided, as an alternative, a plan for selling the stock, this clause was added for the express purpose of making the paper a bilateral contract, instead of an option. However this may be, it has that effect. We do not fail to observe that the action at law was founded on the promise to pay, and not on the promise to sell; but we are not concerned with any question of pleading or of remedy. We have been determining what this contract, according to its face, means, and whether it clearly imposes a definite obligation from which, in one form or another, there was no escape, or whether it imposed no obligation whatever.

Having concluded that it is of the former character, do the circumstances make probable that this was a mistake? We see no such circumstantial probability, of preponderating character. True, the stock had no listed or market value; but that is not infrequently true of the stock of a private corporation, and it does not deter existing stockholders and directors from dealing in the stock. True, also, that the company had never made profits; but it was still in the development stage and there was nothing to indicate that any of the parties had lost confidence in the company's future. The fixed minimum price was, indeed, on a higher basis than the original cost, but not necessarily an extravagant basis, with the ideas the parties then held. The

record indicates that Bauer relied upon his associates, House and Weyand, to make this sale, because they were engaged, in New York, in the business of selling similar stocks, and that he had full confidence in their ability to do so; indeed, it is not testified that any one then felt or suggested doubt that the sale could be made. It follows that there was nothing strange or reckless in a willingness by Bauer to assume an obligation of $10,000, protected by $30,000 of the stock. Nor was there lack of motive. The capital stock was equally divided between the two parties or factions. Bauer and his associates might well have regarded it as important to get into a position where they could control the company. Then, too, they already had $35,000 of loans, besides their stock investments, at stake, and they could well afford to assume some obligations for the sake of getting Biser to contribute indirectly to paying the corporate debts which they held, or to raising further development funds so as to relieve them. It is said, however, that there was unissued capital stock which could have been put on sale to get development funds, without fixing any obligation on Bauer and associates. This is true enough, but not conclusive. It is not likely that such an issue or sale of treasury stock as to shift the balance of control would have been permitted, and, if it had been, it would have lessened the proportionate stockholding interests of Bauer and associates, which proportion was, by the contract in question, maintained and increased.

Upon this review of the virtually undisputed facts, disclosing no strong inherent probability of mistake, we thus find the typical case where, according to Mr. Justice Miller, in the Maxwell Case, supra, speaking of a proposed reformation, "the testimony on which this is done must be clear, unequivocal, and convincing, and it cannot be done upon a bare preponderance of evidence, which leaves the issue in doubt," and where, in the language of Chancellor Kent, in the Lyman Case, supra, the mistake must "be made out in the most clear and decided manner and to the entire satisfaction of the court"; and we are brought to the inquiry whether the alleged mistake is thus established in this case.

A detailed discussion of the evidence would not be profitable. No one, except the four parties, was present to hear what was said. Biser says there was a definite agreement that he was to receive the money; the other three say it was distinctly understood Biser should receive nothing, unless they found a buyer for the stock. House and Weyand and Biser are seriously discredited by their later joint connection with the sale of the remaining $32,000 of stock. For this reason, or because their accuracy and recollection are otherwise made doubtful, the testimony of no one of them is very satisfactory. Giving to the clause, "which sale they hereby agree to transact," the force which we think it must have, the evidence of Bauer alone is not sufficient to satisfy the rule. His testimony as to his present recollection of the conversation is direct enough, but the accuracy of that recollection is challenged by his conduct. He was the draftsman of the written contract; a few days later, in his own office, he wrote it over again, fixing definitely the time within which Biser must be paid, but making

no change in the words which import a fixed liability; some weeks later, he wrote a letter, again apparently acknowledging unconditional liability to see that Biser should get his money; and not until after the company's enterprise had fallen into desperate condition did he, so far as the record shows, make any such claim as he now makes. Under such conditions, we cannot regard his testimony, with such support as it may have from House and Weyand, as meeting the requirement of proving the mistake "in the most clear and decided manner and to the entire satisfaction of the court."

The decree must be reversed, with costs, and the case remanded, with instructions to dismiss the bill.

## On Petition for Rehearing.

PER CURIAM. Upon application for rehearing, our attention is directed to several omissions and mistakes thought to be found in the opinion filed. After careful reconsideration, we find nothing of this character which affects the result. We did not undertake to review the evidence in detail, but only to summarize briefly the main features of the situation. Apparently some action had been had toward an issue of the remaining treasury stock, and we were in error in assuming the contrary; but this is not controlling.

One thing should be stated: We did not intend to hold that a liability existed from Bauer to the company for the remaining $5,000 of the total, contemplated, minimum sale price. That question was not involved, and that conclusion would depend upon questions both of law and of fact which we did not consider.

The application for rehearing must be denied.