BAILEY v. LISLE MFG. CO.

(Circuit Court of Appeals, Eighth Circuit. November 6, 1916.)

No. 4609.

1. REFORMATION OF INSTRUMENTS ⬤═▷45(2)—MUTUAL MISTAKE—SUFFICIENCY OF PROOF.

Evidence considered, and *held* insufficient to entitle a corporation to reformation, on the ground of mutual mistake, of a written contract, which was executed after having been read and fully considered at a directors' meeting, and where the other party denied any mistake, and was supported by the circumstances and probabilities of the case.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. §§ 158, 184–188, 190; Dec. Dig. ⬤═▷45(2).]

2. REFORMATION OF INSTRUMENTS ⬤═▷43, 45(2)—ACTIONS—BURDEN AND MEASURE OF PROOF.

In a suit to reform a written contract for mutual mistake, or for mistake on one side and fraud, deceit, or inequitable conduct on the other, the burden of proof rests on complainant, and nothing less than evidence that is plain and convincing beyond reasonable controversy is sufficient.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. §§ 154, 158, 184–188, 190; Dec. Dig. ⬤═▷43, 45(2).]

3. REFORMATION OF INSTRUMENTS ⬤═▷19(1)—RIGHT TO RELIEF—NEGLIGENCE AS DEFENSE.

It is negligence and clear failure to exercise ordinary care for intelligent business men, holding in their hands and reading a proposed written contract, which clearly states their agreement, to rely on any statement or assent made by the opposite party regarding its terms or obligations, rather than upon the written terms themselves, and they are not entitled to invoke the aid of a court of equity to alter the contract after its execution.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. §§ 74–78; Dec. Dig. ⬤═▷19(1).]

4. ESTOPPEL ⬤═▷90(2)—EQUITABLE ESTOPPEL—STATEMENTS AS TO TERMS OF UNEXECUTED CONTRACT.

A party to a proposed written contract, which has not been executed, by assenting to or acquiescence in misstatements by the other party as to its terms, is not estopped to rely upon and enforce the actual terms of the agreement as subsequently executed.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. § 244; Dec. Dig. ⬤═▷90(2).]

Appeal from the District Court of the United States for the Southern District of Iowa; Thomas C. Munger, Judge.

Suit in equity by the Lisle Manufacturing Company against E. R. Bailey. Decree for complainant, and defendant appeals. Reversed.

John G. Park, of Kansas City, Mo. (McVey & Freet, of Kansas City, Mo., on the brief), for appellant.

Howard J. Clark, of Des Moines, Iowa (Orr & Turner, of Clarinda, Iowa, and Clark, Byers & Hutchinson, of Des Moines, Iowa, on the brief), for appellee.

Before SANBORN, Circuit Judge, and TRIEBER and VAN VALKENBURGH, District Judges.

SANBORN, Circuit Judge. E. R. Bailey, the defendant below, appeals from a decree which reforms and modifies the written contract of June 4, 1907, between the Lisle Manufacturing Company, a corporation, and himself, so as to deprive him of thousands of dollars, commissions which, according to the terms of the agreement, he had earned as the general sales agent of that company. As such agent he had made a sale of 15,000 cream separators to the William Galloway Company for $30.80 each, upon which he was to receive settlement and payment under the third paragraph of the contract, which provided that as commission or compensation as general sales agent he should "receive that part of the amount the company received from the sale of separators as is in excess of fifty (50) per cent. of retail list price on all separators he may sell or cause to be sold to the trade or others who may desire to purchase." The Lisle Company appealed to the court to modify this clause of the contract on the ground of mutual mistake, and the court by its decree so modified it that it now reads that Bailey shall "receive that part of the amount the company receives from the sale of separators as is in excess of fifty per cent. (50%) of retail list price on all separators he may sell or cause to be sold to the retail trade," thereby depriving Mr. Bailey of this commission which the Lisle Company by its written agreement contracted to pay him on the 15,000 separators he sold to the Galloway Company and on all other separators sold to the wholesale trade, or to any others than those engaged in the retail trade. Bailey insists that the evidence was insufficient to sustain the finding of a mutual mistake, and this claim has rendered it necessary to make a patient and thorough examination of the record.

[1] This record conclusively establishes these facts: In 1904 and 1905 Bailey was inventing improvements in cream separators, and had completed a model of a separator in the fall of 1905, which he exhibited to and tested in the presence of C. A. Lisle, the president, and William Orr, one of the directors, of the Powers Manufacturing Company, a corporation, and on November 7, 1905, that company made a written contract with Bailey whereby it agreed to pay him "that part of the amount they receive which is in excess of fifty per cent. of the list price as a commission on all machines (cream separators) that he may sell, or cause to be sold, to the trade or to others who may desire to purchase." At that time the Powers Company was without machinery suitable to make separators, and it proceeded to procure and operate such machinery, and changed its name to Lisle Manufacturing Company. The first separator it made was delivered to a purchaser on June 16, 1906. The separator first made was called the Monarch; that made pursuant to the Galloway contracts was called the Galloway separator. On June 5, 1906, Bailey had completed his improvements in cream separators, and had obtained a patent, No. 795,424, therefor. Thereupon the Lisle Company made a contract with him exclusively to make and sell his patented separator, and to pay him "a royalty of five (5) per cent. on actual amount received on each sale of all cream separators manufactured and sold under this contract." In the fall of 1906 Bailey sold about 6,000 separators for the Lisle Company to the

William Galloway Company for $36 each, and on November 17, 1906, the Lisle Company made a written contract with the Galloway Company to make and deliver these separators pursuant to that sale. On May 20, 1907, Bailey sold to the Galloway Company 15,000 cream separators for the Lisle Company at the price of $30.80 each, made a written agreement with the Galloway Company as sales agent of the Lisle Company for the sale and delivery of these separators, and obtained the promissory notes of that company for $12,000 in part payment of the purchase price, and delivered them to the Lisle Company. On June 4, 1907, the Lisle Company made the contract with Bailey which is the subject of this controversy, and which was modified by the court. The first article of that agreement provided that the commission contract of November 7, 1905, and the royalty contract of June 5, 1906, were abrogated and that the agreement of June 4, 1907, should take the place thereof as to all separators manufactured during its life, including those to be made under the Galloway contract for the 15,000 separators. The second paragraph provided that, in consideration of services rendered to the Lisle Company as general sales agent and for the privilege of manufacturing separators under his patents, the Lisle Company would pay him $1 for each separator made and sold by it and that part of 10 per cent. of the annual profit realized by it in excess of $1 upon each separator sold. The third paragraph, which the court modified, provided that:

"The said Bailey is to act on a commission as the general sales agent for the company for the sale of separators, * * * and as commission or compensation he is to receive that part of the amount the company received from the sale of separators as is in excess of fifty per cent. (50%) of retail list price on all separators he may sell or cause to be sold to the trade or to others who may desire to purchase."

The provisions of this contract of June 4, 1907, regarding the royalty or amount agreed to be paid "for the privilege of manufacturing cream separators under patents," it will be seen, differs from the provision of the royalty contract of June 5, 1906, whose place it took, in this: That under the contract of June 5, 1906, he was to receive 5 per cent. of the amount of the sales, while under the contract of June 4, 1907, he was to receive $1 on each separator sold, and the excess of 10 per cent. of the net profits over that amount. But the provision of the contract of June 4, 1907, regarding Bailey's service as general sales agent and the commission the company was to pay him therefor, is in effect the same as that in the commission contract of November 7, 1905, whose place the contract of June 4, 1907, took. During a few days preceding June 4, 1907, C. A. Lisle, the president of the Lisle Company, Edwin Lisle, his son, the secretary of the company, and William Orr, one of the directors of the company, an attorney at law, who sometimes acted as the company's attorney, had been objecting to the payment of the royalty of 5 per cent. on the sales of the 15,000 separators, and negotiating with Bailey to make the contract of June 4, 1907, in the place of the two preceding contracts, and they had finally agreed with him that, instead of the 5 per cent. on the sales owing him under the royalty contract, he should receive $1 for each of the 15,000 sepa-

rators sold and the excess of 10 per cent. of the profits over that amount. After this agreement had been reached, a meeting of the directors of the Lisle Company was called for June 4, 1907. There were present in the forenoon of that day at the meeting of the directors C. A. Lisle, Edwin Lisle, Orr, Standage, Ferris, Ganiard, and Bailey, and Vice President Woolson. The contract of June 4th had been prepared and was in the hands of the company. C. A. Lisle read it aloud to the gentlemen present, paragraph by paragraph, commented upon it, all had an opportunity to read it, there was a discussion of some of its terms for an hour or two, and then an adjournment until the afternoon, to enable Mr. Woolson, the vice president, who said he did not understand it, to read and study it. At the meeting in the afternoon a resolution was passed by the board, without further discussion or objection, which authorized and directed the proper officers of the company to execute the contract which had been read in the morning, and they did so. After this agreement and the second Galloway contract were made, the Lisle Company made and sold few more Monarch separators, and devoted itself chiefly to the manufacture and delivery under the Galloway contract of a separator approved by that company and called the Galloway separator.

The Lisle Company paid Bailey $1 on each of these separators, but it never paid him any of the excess of the amount of the sales over 50 per cent. of the retail list price which it received for them, or any of the excess of 10 per cent. of its net profits over the amount of $1 per separator, and in 1912 he brought an action to recover these amounts. As by the terms of the contract the company was clearly liable to pay them, and it could not defend the action at law on the ground that it was not bound to do so by that contract, it brought this suit to so modify the contract on the ground of mutual mistake as to relieve it from liability on account of the sales of its separators to the Galloway Company, and to other wholesale dealers, which constituted the great bulk of its sales. The action at law awaits the result of this suit. The facts thus far stated are either undisputed or conclusively established.

The company claimed that before the contract of June 4, 1907, was made Bailey agreed with C. A. Lisle, Edwin Lisle, and Orr that by that contract he would waive his commission of the amount of the sales in excess of 50 per cent. of the retail list price of the 15,000 separators sold to the Galloway Company, and to other wholesale dealers; that C. A. Lisle stated to the directors at their meeting on the morning of June 4, 1907, in the presence of Bailey, that such was the effect of the contract of that date; that Bailey then assented to that statement; and that by mutual mistake no provision was written into the contract of June 4, 1907, to that effect. Bailey denied all this, and the testimony regarding it is conflicting. The contract of November 7, 1905, for the excess of the amount of the sales over 50 per cent. of the retail list price was a contract for a commission, and this excess will be called henceforth the commission. The contract of June 5, 1906, for the 5 per cent. of the amount of the sales was a contract for a royalty, and that 5 per cent., and its subsequent modification to $1 per separator and the excess over that amount of 10 per cent. of the profits, will be

called the royalty. The question was: Did Bailey and the company mutually agree that the contract of June 4, 1907, should provide that he should not have this commission on the 15,000 separators he sold to the Galloway Company, and was this provision omitted from the contract by a mutual mistake of the parties? Orr, the treasurer of the company, testified that when the first Galloway contract for the 6,000 separators was presented to the board of directors in November, 1906, he said in the presence of Bailey that the company could not afford to pay any commission on that sale, and "the matter was discussed there, and it was stated that there would be no commission on that sale." On cross-examination he testified:

"I think nothing was said at the meeting in November, 1906, concerning the Bailey contract. It was a directors' meeting, related to accepting the Galloway contract. It was mentioned there that Mr. Bailey was only to get the 5 per cent. on the 6,000 contract, but his contract was not discussed. There was no contract discussed at all with Mr. Bailey at this time, and nothing presented in writing aside from the Galloway proposition for 6,000 machines."

Mr. Bailey testified on this subject:

"When the first Galloway contract was brought back in November, 1906, I do not know that my compensation was taken up in a special way; nothing was said outside the contract that was then in force."

The foregoing is the only evidence on this specific issue. At that time, November, 1906, there was a written contract of November 7, 1905, between the company and Bailey that he should act as general sales agent of the company, and that he should receive his commission, and he had made the sale of the 6,000 separators under that contract. There is nothing in this testimony to establish the fact that Bailey made any agreement to modify that contract, or that the company gave, or promised to give, him any consideration for such an agreement of modification. The evidence is clearly insufficient to abrogate or modify the written contract of November 7, 1905, and when, in June, 1907, the parties came to the negotiations for the contract of June 4th in that year, the Lisle Company stood bound under the contract of November 7, 1905, to pay him his commission, and under its contract of June 5, 1906, to pay him his royalty, on the 15,000 separators which in May, 1907, he had contracted to sell for it to the Galloway Company, if the Lisle Company accepted that contract.

In the negotiations for the contract of June 4, 1907, all the witnesses agree that there were propositions and suggestions of different amounts of royalty, and repeated and prolonged discussions as to the amount of royalty, that the company should agree to pay, but no such suggestions of amounts, and no discussion of the amount of the commission, that the company should agree to pay. C. A. Lisle testified that, when Bailey brought the second Galloway contract, it provided for a reduction of the existing selling price of the separators from $36 to $30.80, and that the company objected "to paying 5 per cent., and the matter was discussed pro and con for several days"; that in the discussion he offered 10 per cent. of the profits, and Bailey rejected the offer, and demanded that he have $1 on each separator; that, of course, Mr. Lisle wanted less than $1; that he told Bailey that he would give no more

than $1, and they finally agreed on $1 on each separator and the excess of 10 per cent. of the profits over that amount. He testified that this agreement related to the 15,000 separators sold to Galloway only, and that the royalty and the commission on the Monarch separators were to remain as they had been in the past. Edwin Lisle testified that he was present at the final agreement between C. A. Lisle and Bailey; that they were talking; that he came up to them, and as he came his father, C. A. Lisle, said, "I was just telling Mr. Bailey that we cannot accept that Galloway contract on the five per cent. basis;" that Bailey replied he was sure they would make lots of money by taking it on; that his father then said, "Mr. Bailey, the very best we will do is $1 apiece on the Galloway machines, and we will give you 10 per cent. of the profits gladly, and will continue to pay on the Monarch just the same as we always have;" that Bailey answered, "I will accept the dollar royalty now," or commission (I don't know what he said), "and I will expect to get the 10 per cent., provided it amounts to more than the dollar;" and C. A. Lisle said, "Well, suppose you draw up a contract along that line and submit it to the people"—the board of directors. Orr testified that one day C. A. Lisle called him into the bank, where he met Bailey and Brown; that this was some time after May 22, 1907, when they had talked of accepting the second Galloway contract; that Bailey said he ought to have the 5 per cent., and Lisle said he would never pay it; Brown said a good way to settle it was to pay him a per cent. of the net profits; Lisle said he would be willing to pay 10 per cent. of the net profits; Bailey said he could not accept that, and would think the matter over; that he could not wait until the end of the year to get some pay; that thereupon he (Orr) said a payment could be made on the 10 per cent.; that Mr. Lisle said that he would never approve of the Galloway contract with a 5 per cent. royalty clause in Mr. Bailey's contract. He did not say anything about paying Mr. Bailey anything about list price on the Galloway machines. Bailey testified to these conversations, and that the only subject of them was the reduction of his 5 per cent. royalty; that they all agreed, at the close of these conversations, to the modification of the royalty from 5 per cent. of the sales to $1 on each separator and the excess over that amount of 10 per cent. of the profits; that the terms of the contract of June 4, 1907, were agreed upon in that way before the meeting of the board on June 4, 1907, and that "the matter of releasing or cutting down his commission of all over 50 per cent. of the list price was never discussed with him, and he never made any such agreement; that the discussion did not extend outside the question of royalty."

The foregoing is all the testimony as to the agreement upon the terms of the contract in litigation before that contract was drawn and presented to the board, except that there was evidence that before these conversations and the oral agreement in which they resulted a proposed contract had been drawn, which had been changed by interlineation, which contained very different terms from those in the contract of June 4, 1907, and which had been repeatedly examined, and which was not satisfactory. Under this evidence, there is no escape from the conclusion, not only that the company failed to prove that there was any

agreement between Bailey and the company prior to the draft of the contract of June 4, 1907, and its presentation to the board on that day, that he should waive or renounce or reduce his commission on the sale of the separators under the second Galloway contract, but also that the weight of the evidence is that no such agreement was either discussed, negotiated, or made, and that the only subject upon which they had agreed was upon the reduction of the royalty. So it was that the parties came to the meeting of the board on June 4, 1907, bound by the commission contract of November 7, 1905, and the royalty contract of June 4, 1906, under an oral agreement to make a written contract and change the royalty from 5 per cent. of the amount of the sales of the 15,000 separators to $1 per separator and the excess of 10 per cent. of the net profits over that amount, and to embody the commission contract and the royalty contract thus modified in the new written agreement. The new agreement was drawn. It conformed to this oral agreement and embodied its terms. There was no mutual or other mistake in its draft.

But the company insists that the evidence of the acts of the parties on June 4, 1907, entitles it to a reformation of the contract: (1) Because they establish a mutual mistake in the execution of it; and (2) because Bailey is estopped by his acts on that day from resisting such a reformation. In the forenoon of June 4, 1907, the contract was presented to the officers and members of the board of directors of the company for examination and execution. There was more than one copy of it. C. A. Lisle, the president, had one copy from which he read aloud to the gentlemen present, and some of the other directors had the other copy, and at one time during the meeting it was in the hands of Orr, the treasurer of the company and the attorney at law. Directors C. A. Lisle, Edwin Lisle, Orr, Standage, Ferris, Ganiard, and Bailey, and Vice President Woolson were present. C. A. Lisle testified, in answer to the question, "What was said, if anything, with regard to what the compensation was of the Galloway contract for machines manufactured under those circumstances?" that he explained that it "was 10 per cent., on a 10 per cent. basis, with a $1 guaranty, on all sales made and delivered and paid for"; that Mr. Orr said that was correct, that was the way the contract was made, and that the matter of the Monarch separators was to be on the same basis as before. He testified that Mr. Bailey explained that the matter of the Monarch separators was to be on the basis of 50 per cent. of all above half of the list price. He did not testify that he told the directors that the reduced royalty was all that Bailey was to receive on the Galloway separators, or that Bailey had agreed to renounce or waive his commission contract. Edwin Lisle testified that C. A. Lisle said to the meeting that he and Bailey had agreed to combine the two contracts into one, to carry on the Monarch business as theretofore, and that Bailey had decided to accept 10 per cent. of the net profits as his compensation, his commission or royalty, on the Galloway contract, but that he must have $1 down and the balance of the 10 per cent. at the close of the year; that he then turned to Bailey, and asked him if that was correct, and he answered, "Yes." He further testified that Mr. Orr said

that, as he understood it, Bailey waived everything but his $1 and the 10 per cent., providing there was a 10 per cent., and that Bailey nodded his head, "Yes." Mr. Orr testified that Lisle proceeded to read the contract; "that he read down to the clause where it provided for the 10 per cent. royalty or profit, whatever you call that 10 per cent.;" that he explained that, and said that it applied only to the Galloway contract, or contracts of a similar nature. He then testified that he asked Mr. Lisle if that was all the compensation Mr. Bailey was to receive on the Galloway contract, and he said that it was; that he looked over towards Bailey, but Bailey did not say anything, or do anything; that he did not object to the statement. Mr. Orr also testified thus:

"When Mr. Lisle read down to the clause in the contract which states the 50 per cent. of the list price agreement, again he said that that applied to the Monarch machines, and other machines that were sold in the same way as the Monarch was sold. I don't remember that Bailey said anything in regard to that. He was there and took part. The main talk was about the 10 per cent. agreement."

He also testified:

"When I asked Mr. Lisle if that was all that Mr. Bailey was to get under the Galloway contract, that there was to be no commission for selling, he said that Mr. Bailey waived any commission on account of the large number of machines and the royalty would amount to so much."

This was all the testimony in support of the contention that at this meeting Bailey by act or silence assented or agreed to the proposition that by the contract to be made or otherwise he waived or surrendered, or would waive or surrender, his commission of that part of the amount realized from the sales of the 15,000 separators in excess of the retail list price. When this testimony is examined in view of the issue whether the alleged admission of Bailey extended over a waiver of the 50 per cent. commission on sales of the 15,000 separators, or was limited to the modification of the royalty, it is far from convincing. Bearing in mind the fact that the royalty on the Monarch and on all other machines under the contract of June 5, 1906, was 5 per cent. of the sales and the fact that the reduction of this royalty was the only reduction discussed in the negotiations for the contract, or at this meeting of the board of directors, the statement that the matter of the Monarch separators was to be on the same basis as before is perfectly consistent with the fact that the commission on the Galloway separators was to be the same as before, and that the only reduction was on the royalty upon them.

Another striking fact about this testimony is that, so far as it sustained the contention that Bailey by word or act consented or agreed that he waived or surrendered, or that the contract under discussion provided that he should surrender or waive, his commission, it rests on hearsay and the testimony of Mr. Orr, who, according to the testimony of Edwin Lisle, stated at the meeting that, as he understood the contract, Bailey waived everything but his dollar and the 10 per cent. Mr. Orr was certainly incorrect in his understanding of the contract which was then before him and under consideration, for it not only fails to evidence any waiver or sur-

render of anything except the difference between the 5 per cent. on the sales and the $1 and the 10 per cent. on the profits, but provides for the payment by the company of the very same commission, to wit, the excess of the sales above 50 per cent. of the retail price on all Bailey's sales, and in the first paragraph of it expressly provides that the settlement on the 15,000 separators shall be made under this agreement. As Mr. Orr was mistaken in his understanding of the contract, he may be in his understanding of what was said and done at the meeting. The testimony of Edwin Lisle as to the admission of Bailey is founded on what he heard said by Orr, and the testimony of Mr. Orr that, when Lisle was reading the 10 per cent. clause, he asked him if that was all that Mr. Bailey was to get under the Galloway contract, and Lisle answered that Mr. Bailey waived any commission on account of the large number of the machines and the royalty would amount to so much, is testimony of what he heard Lisle say. Lisle himself was on the stand, and he did not testify to any such statement or fact. The testimony of these witnesses to the sayings of each other about facts is not as persuasive as would be the testimony of the sayers to the facts.

But their testimony on the crucial issue in the case is shaken and contradicted by the evidence of others present. Bailey testified that there was more discussion at the meeting of the 10 per cent. clause than of any other; that the commission of 50 per cent. of the list price was not mentioned to his knowledge; that the paragraph in the contract regarding it was read to the board and remarks were called for; that he made no remarks about the contract, and as he was interested he did not vote upon it; and that the matter of relinquishing or reducing his commission of the excess of the sales over 50 per cent. of the list price on the 15,000 separators was never discussed with him, and he never agreed to do so. He testified that Mr. Woolson, the vice president, was not satisfied with the 10 per cent. clause, and the meeting adjourned to the afternoon, and Woolson took a copy of the contract. Woolson was called as a witness and examined by the company, but it asked him no questions about the acts and sayings at the meeting, and when Bailey's attorney undertook to do so the company objected, on the ground that such testimony was not cross-examination, and he did not testify upon the subject. Director Ferris was in the city during the trial, and he was not called to testify. Director Standage testified that he heard the discussion at the meeting; that Bailey wanted a profit above the 5 per cent.; that Lisle said they could not pay five per cent., but he would pay $1 for each separator; that, if it amounted to more, Bailey was to have it; that he "was to have half of the price of the machines, the purchase price, the selling price, half of the purchase price; that is my meaning of it. He wanted a 10 per cent. profit I think. Mr. Lisle said he could not pay it, and Mr. Orr said the same. Mr. Bailey argued for that amount, for $1 and 10 per cent. They said they would pay him $1; that is my memory. I understood Mr. Bailey agreed to it." Director Ganiard testified that he was present when the contract was read aloud to the members of the board by C. A.

Lisle in the forenoon of June 4, 1907; that he also read it to himself; that Mr. Orr was reading it; that he did not hear any claim advanced by any of the company's officers that Bailey was not to have commission on the Galloway business; that they wanted him to reduce the royalty, but that no claim was ever advanced to him that Bailey should not get the excess over 50 per cent. of the list price on the Galloway business; that "they considered the royalty too high. I do not think there was anything else objected to. I know there was not."

After the contract was signed, the Galloway contract was accepted, and all parties entered upon the performance of it. The Lisle Company rendered accounts monthly to Bailey, and paid him $1 on each separator sold under the Galloway contract; but it never paid him the excess of 10 per cent. of the profits, if any, nor the commission of the excess of these sales over 50 per cent. of the retail list price. of the machines, and its officers testify that he never demanded nor claimed these amounts until February 19, 1912. Bailey testified that, shortly after receiving the first account of settlement under the second Galloway contract, he noticed that the company had credited him with only the $1 per machine, and he went to Edwin Lisle and asked him where the commission was for the machines; that he said there was no commission, that all they were going to pay him was the $1 per machine, and that he told Lisle that that was not according to his understanding at all; that he told Director Ganiard about it, but that after thinking it over he concluded that, as they were just starting the business, he would let the matter rest in the hope of an amicable settlement later, and he concluded to stand upon his contract. Edwin Lisle testified that no such conversation took place between him and Bailey. There was other evidence in the case, but none that can change the result which that which has been recited compels.

[2] The jurisdiction of a court of equity to reform a written contract for mutual mistake, or for mistake on one side and fraud, deceit, or inequitable conduct on the other, is indisputable. But the purpose of a written contract is to furnish a record of the terms of the agreement of the parties not easily impeached, and thereby to avoid subsequent disputes and conflicting testimony and claims regarding its terms and their meaning. To accomplish this purpose, and to prevent such disputes from annulling written agreements, two rules have been firmly established in equity: First, that the burden is on the complainant to prove the mutual mistake, or the mistake of one party and the deceit, fraud, or inequitable conduct of the other, upon which he relies for a modification or avoidance of the contract; and, second, that in view of the written record of the terms of the agreement made at the time a preponderance of the evidence is insufficient, and nothing less than evidence that is plain and convincing beyond reasonable controversy will constitute such proof as will warrant a modification or reformation of a written agreement. Simmons Creek Coal Co. v. Doran, 142 U. S. 417, 435, 12 Sup. Ct. 239, 35 L. Ed. 1063; Thallmann v. Thomas, 111 Fed. 277, 283, 49 C. C. A. 317, 323; Hearne

v. Marine Ins. Co., 87 U. S. 488, 490, 22 L. Ed. 395; Maxwell Land Grant Case, 121 U. S. 325, 381, 7 Sup. Ct. 1015, 30 L. Ed. 949; Biser v. Bauer, 205 Fed. 229, 232, 123 C. C. A. 417, 420.

The circumstances surrounding these parties when they entered upon the contract of June 4, 1907, the fact that they were then bound by contracts under which Mr. Bailey was entitled to receive upon the sales of the 15,000 separators as commission as sales agent the excess of the sales above 50 per cent., of the retail list price of the machines and a royalty of 5 per cent. of the sales, the fact that the evidence does not establish any assent or agreement on his part to make a contract to reduce his commission, although it does show that he agreed to make a contract reducing his royalty prior to the time that the contract of June 4, 1907, was drawn, the fact that there was never any discussion or debate about the reduction of the commission or the amount of it, but the provision of the contract of June 4, 1907, regarding it was in effect, the same as the provision in the contract of November 7, 1906, the improbability that there would have been a change of this commission or a relinquishment of it without debate or discussion, the fact that the testimony as to the conversation and statements in the presence of the board on June 4, 1907, when the draft of the contract was in the hands of the officers of the company and was being considered, is conflicting, and it is not probable that Mr. Bailey would have consented to a relinquishment of his commission on that day without debate or discussion or objection, have forced our minds to the conclusion that in this case the complainant fell far short of establishing by even a preponderance of the testimony, much less by evidence that is plain and convincing beyond controversy, either that there was a mutual mistake in the drafting or signing of the contract, or that the defendant Bailey by silence, act, or speech at the meeting of the board of directors of the company ever indicated his admission or assent to any statement that the royalty was all the compensation he was to receive for the sale of the 15,000 separators, that the commission clause of the contract was inapplicable to the sale of these separators, or that he relinquished his commission upon them.

[3] Even if the fact were established that Bailey assented to Lisle's or Orr's misstatement of the terms or meaning of the contract after it had been written and when it was in the hands of the company ready to be signed, where any officer of the company could, and some of them did, read it, that fact would present no sufficient ground for its reformation or modification. Conscience, good faith, and reasonable diligence condition the right to relief in equity. The contract was being read by and to the officers of the company, not to see what the company and Bailey had agreed upon, but to see whether or not it expressed their agreement. It is the duty of one, when he becomes a party to a written contract, to examine its provisions and determine for himself what obligations and what liabilities it imposes, and, if need be, to seek legal advice upon that subject. It is negligence, and clear failure to exercise ordinary care or diligence, for intelligent business men, one of whom is a lawyer, holding

in their hands and reading a written contract which clearly states their agreement, to rely on any statement or assent made by the opposite party regarding the terms or obligation of the agreement, rather than upon the written terms themselves, and "courts of equity will not relieve parties from the consequences of their own folly, or assist them when their condition is attributable to a failure to exercise ordinary care for their own protection." Great Western Mfg. Co. v. Adams, 176 Fed. 325, 327, 99 C. C. A. 615, 617; Travelers' Ins. Co. v. Henderson, 69 Fed. 762, 767, 768, 16 C. C. A. 390, 395, 396; Burk v. Johnson, 146 Fed. 209, 215, 216, 76 C. C. A. 567, 573, 574; Upton v. Tribilcock, 91 U. S. 45, 50, 23 L. Ed. 203.

[4] Nor can the complainant escape from the effect of this principle of equity on the ground that, if Bailey assented to or admitted the truth of the misstatements of the terms of the proposed contract which Lisle and Orr made, he would be estopped to rely upon and enforce the actual terms of the agreement, or would be guilty of deceit or inequitable conduct, (1) because that cause of relief was not pleaded, and (2) because such an admission or assent would not constitute actionable deceit, estoppel, or inequitable conduct. In Insurance Co. v. Mowry, 96 U. S. 544, 547 (24 L. Ed. 674), Mr. Justice Field, delivering the opinion of the Supreme Court, said:

"An estoppel cannot arise from a promise as to future action with respect to a right to be acquired upon an agreement not yet made. * * * The doctrine has no place for application when the statement relates to rights depending upon contracts yet to be made, to which the person complaining is to be a party. He has it in his power in such cases to guard in advance against any consequences of a subsequent change of intention and conduct by the person with whom he is dealing. For compliance with arrangements respecting future transactions parties must provide by stipulations in their agreements when reduced to writing."

The theory of estoppel, deceit, or inequitable conduct utterly fails here, because the complainant had the same knowledge and means of knowledge of what the agreement to be signed was that Bailey had, to wit, the written contract itself in the hands of its officers, and knowledge of the fact by the deceiver, and absence of knowledge and of the ready means of knowledge by the deceived, are indispensable to an estoppel, or to such deceit or inequity as will warrant the avoidance of a written contract. Chicago, St. P., M. & O. Ry. Co. v. Belliwith, 28 C. C. A. 358, 362, 83 Fed. 437, 441.

The decree below must be reversed, and the case must be remanded to the court below, with directions to dismiss the suit on its merits and to proceed with the trial of the action at law. And it is so ordered.