## UNION CENTRAL LIFE INS. CO. v. DEUTSER et al.

## GENERAL AMERICAN LIFE INS. CO. v. MARLBORO SHIRT CO., Inc., et al.

### Nos. 2223, 2242.

District Court, D. Maryland.
April 23, 1935.

J. Kemp Bartlett, of Baltimore, Md., and Lewis Fogle, of Houston, Tex., for

Alex and Isidore S. Deutser and Celia Zaidenfeld.

Randolph Barton, Jr., and Forrest Bramble (Barton, Wilmer, Ambler & Barton), both of Baltimore, Md., for Union Central Life Ins. Co.

Maloy, Brady & Yost, of Baltimore, Md., for General American Life Ins. Co.

Simon E. Sobeloff, Milton H. Talkin, and Roszel C. Thomsen, all of Baltimore, Md., for Marlboro Shirt Co.

**WILLIAM C. COLEMAN, District Judge.**

These are interpleader proceedings, brought under 28 U.S.Code, § 41 (26) (28 U.S.C.A. § 41 (26), to determine who is entitled to payment under certain insurance policies. The cases arise on the defendants' motions to dismiss the plaintiffs' amended answers and cross-bills in proceedings which were instituted by the Union Central Life Insurance Company and the General American Life Insurance Company. The first proceeding was instituted November 17, 1933, and the second December 16, 1933. The cases were docketed as equity No. 2223 and No. 2242, respectively, and were heard together June 18, 1934.

The policies involved are as follows: No. 981791 of the Union Central Life Insurance Company for $1,500, with Alex Deutser, brother of the insured, named as beneficiary; No. 177549, No. 137286, and No. 136719 of the General American Life Insurance Company for $2,500, $5,000, and $5,000, respectively, and with Alex Deutser named beneficiary on the first policy, Isidore Deutser named beneficiary on the second policy, and Isidore Deutser and Celia Zaidenfeld, brother and sister of the insured, named beneficiary on the third policy. These four policies and five others (not in suit) were involved in a transaction of June 19, 1933, around which the case centers, and in connection with which the following papers were executed on that date: (1) An agreement between Herman Deutser, of Houston, Tex., the insured, and the defendant, the Marlboro Shirt Company, Inc., of Baltimore (hereinafter called "Marlboro"), whereby Deutser purported, in consideration of a bill of merchandise purchased from Marlboro on June 19, 1933, to promise to pay $4,540.25, which is the exact amount, within a few cents, of the amount proved in the bankruptcy proceeding of a certain White House, Inc., of Houston, Tex., another shirt company,

hereinafter referred to as "White House," and the amount written off as a bad debt by Marlboro on December 31, 1931, the day of the adjudication in bankruptcy of White House. The promise to pay $4,540.25, purported to be evidenced by a demand note, and the agreement further recited that the receipt of merchandise was acknowledged by Deutser; and, finally, the agreement provided that, as further guaranty for the payment of the merchandise, Deutser had executed, in favor of Marlboro, a deed of assignment for "all his equity in life insurance policies as listed in said deed of assignment"; (2) a demand note by Deutser to Marlboro for $4,540.25; (3) a memorandum of assignment which was made out, according to its terms, only as a preliminary paper, until formal assignment could be recorded by the various companies. The assignment memorandum referred specifically to nine insurance policies, including the four involved in this suit, and purported to transfer all benefit and advantage to be derived from the policies, "as the interest of the assignee may appear" to Marlboro; (4) an invoice of shirts purported to be sold to Deutser by Marlboro for $4,540.25; (5) a receipt signed by Deutser for the shirts specified in the invoice; and (6) three blanks filled in as formal assignments of the three policies issued by the predecessor of General American Life Insurance Company, and dated as formally recorded in the offices of the insurance company, June 23, 1933. (No formal assignment of the Union Central policy, on any blank furnished by the insurance company, appears among the papers.)

In accordance with the agreement of June 19, 1933, the insurance policies were delivered by Deutser to Marlboro. Upon the death of Deutser on August 17, 1933, the beneficiaries originally named in the policies demanded that Marlboro surrender them, alleging that the shirts named as consideration in the agreement had not been delivered; that they did not now want delivery, because Marlboro's part in the transaction of June 19th was fraudulent, and should be set aside.

Marlboro refused to surrender the policies, answering that the shirts were never intended to be delivered, but that the transaction of June 19th was executed for the purpose of establishing security for the payment of the old account owed Marlboro by White House. White House was a shirt company in which Deutser was a

stockholder and for which he was buyer. The obligations of this company Deutser had allegedly orally guaranteed from time to time on his trips to Baltimore, during which he purchased shirts from Marlboro for White House.

As noted above, interpleader proceedings were instituted by the Union Central Life Insurance Company on November 17, 1933. The money due under the policy No. 981791 was deposited in court. Alex Deutser, the original beneficiary, was designated plaintiff, and Marlboro defendant in the proceedings now before the court, which raise the issue of fraud, alleged by the plaintiff in his amended answer and cross-bill. The same steps were taken by the General American Life Insurance Company on December 16, 1933, with the result that Isidore Deutser and Celia Zaidenfeld, as well as Alex Deutser, became plaintiffs. Prior to the hearing of the two cases on June 18, 1934, the plaintiffs, under Equity Rule 58 (28 U.S.Code §§ 721 to 723 [28 U.S.C.A. following section 723]), had submitted interrogatories, upon leave of the court, to various officers of Marlboro and they had duly filed their answers.

From the oral testimony which has been produced, and from the various letters, telegrams, and accounts received in evidence, the following picture develops of circumstances preceding the transaction of June 19, 1933:

During the period from September 9, 1930, and December 1, 1931, Deutser bought various quantities of shirts from Marlboro for White House, and, according to the testimony of I. Rosenbloom, secretary and treasurer of Marlboro, from time to time orally assured officers of Marlboro, sometimes separately and sometimes in the presence of each other, that he (Deutser) would see to it that Marlboro lost nothing on the White House account. December 31, 1931: White House was adjudicated bankrupt and the balance due on the account, $4,540.46, was written off as a bad debt by Marlboro. January 19, 1931: Marlboro notified its credit indemnity company of the loss. This loss appears to have been accepted as $4,540.31. For this loss, and others during the period of the policy, totaling about $32,000, Marlboro subsequently, September 7, 1933, received a settlement from the credit indemnity company of $10,000, and a release by the credit indemnity company to Marlboro of all salvage rights on the bad debts. No men-

tion was made by Marlboro to the credit indemnity company of Deutser's oral guaranty. Dividends totaling $432.36, collected by the indemnity company in the bankruptcy proceeding of White House, were remitted to Marlboro after June 19, 1933. February 16, 1932: Marlboro filed proof of debt in the White House bankruptcy proceeding for $4,540.31. April 30, 1933: Deutser telephoned from Houston, Tex., to I. Rosenbloom, secretary and treasurer of Marlboro, according to the latter's testimony; Deutser explained who he was; brought up the matter of the guaranty; declared the outstanding debt of White House to Marlboro was bothering his conscience; and stated that he had finally found what he believed was a method of carrying out his promises. According to Rosenbloom, the method he proposed was to assign his insurance policies to Marlboro as security for the payment of the White House debt; that, upon assurances from Rosenbloom that this arrangement would be satisfactory to Marlboro, Deutser proceeded to announce that he was contemplating opening a new store in Houston. In order to strengthen his position with the rental agents, Deutser requested that Rosenbloom wire him that Marlboro would supply shirts for the new store. May 1, 1933: In accordance with Deutser's request, Rosenbloom telegraphed Deutser, "Would gladly serve you Marlboro shirts for your new store." On the same day Deutser telegraphed Rosenbloom that he (Deutser) was encountering difficulties with a possible raise in rent, and requested another telegram to "bluff" the rental agents. Later, on the same day, Rosenbloom sent the requested telegram, advising dropping the proposition unless the rent was kept within specific limits. May 14, 1933: Deutser telegraphed Rosenbloom that the lease for the new store had been signed two days before, and that he planned to come to Baltimore the following month "to fulfill my promises." May 20, 1933: Deutser wrote that he preferred not to consider placing orders for shirts for about six or eight weeks, since his new store would not be opened until about September 1st. June 19, 1933: The various documents were executed which gave rise to the issues in the present case.

At the trial, the plaintiffs called Phillip Epstein, office manager and auditor of Marlboro, who testified, on direct examination, that the shirts (stipulated in the agreement of June 19th, as the considera-

tion for Deutser's promise to pay $4,540.25, and as consideration for Deutser's assignment of his insurance policies to Marlboro), had never been delivered. The plaintiffs offered further testimony by Isidore Deutser and Alex Deutser relative to the background of the transaction of June 19th; and offered various papers, letters, and telegrams. After putting in evidence two depositions regarding a settlement between Marlboro and its credit indemnity company, the plaintiffs rested.

Over objection by the plaintiffs, the defendant, on cross-examination of Epstein, developed testimony in support of the defendant's contention that the set of papers, executed on June 19th, were never intended to take effect as written, but that the assignment of the policies was made for the purpose of establishing security for the payment of the old White House account which Deutser had orally guaranteed. Epstein testified, in substance, that he drew the papers without the aid of an attorney, but with resort to a digest of legal forms which he had in his office, after Deutser had requested the agreement be evidenced in this way, in order that it might meet, according to Epstein's version of what Deutser said, technical requirements of Texas law. In further support of its theory of the case, the defendant offered in evidence its answers to the interrogatories already referred to. These were received by the court, subject to the plaintiffs' exceptions.

At this point the court suspended the taking of further testimony, pending a determination of the questions, first, whether or not the plaintiffs had sustained their burden of proving fraud by the evidence introduced by them; and, second, what effect should be given to the testimony developed by the defendant on the cross-examination of Epstein and to the answers to the interrogatories which had been propounded by the plaintiffs, but which were offered in evidence by the defendant.

As to these questions, the court concluded: First, upon the entire evidence so far submitted, the plaintiffs had not sustained their burden of proving fraud; plaintiffs having had this burden as the alleging party, and the nature of the transaction, the dates and the amounts of money and of merchandise, etc., involved, raising definitely a prima facie inference that the transaction of June 19th might in fact have been what the defendant was contending

for. Second, the answers to the interrogatories should not be, nor had they been, treated as evidence in reaching the first conclusion. However, they had been an aid to the court in disclosing the contention of the defendant and in bringing the court to a conclusion that there was prima facie sufficient evidence to support the defendant's contention. Because of the then incomplete nature of the testimony in the case, the defendant was required to present evidence in support of its theory of the case; and thereby the plaintiffs on their part were thus given an opportunity by cross-examination to disclose (1) any further evidence they might have of fraud; and (2) if not of fraud, then of the fact that the transaction of June 19, 1933, was not capable of the construction for which the defendant contended.

At the continued hearing, no evidence of any additional significance was produced by either side other than that the president of Marlboro testified that credit in ordering goods had never been denied to Deutser, and that, contrary to the contention of the plaintiffs, shortly after Deutser's death, his brother, Alex Deutser, had negotiated for a settlement of the old debt for $1,500, so that the insurance policies might be released. This offer of compromise was supported, in substance, also by the testimony of the attorney, a member of the bar of this court, who at that time was representing Marlboro, and was present during the negotiations for the compromise. The defendant supported, with testimony of its officers, the answers to the interrogatories introduced at the first hearing, particularly with respect to the absence of any demand for the delivery of the shirts specified as consideration in the agreement of June 19th. The plaintiffs reiterated their lack of any knowledge whatsoever of the claim of an oral guaranty, until after their brother's (Herman Deutser's) death, and they sought to introduce certain depositions. The only parts of these depositions that were admitted were the testimony of a real estate broker and a contractor with respect to what they did for Deutser in connection with his plan for establishing his store in Texas, and the testimony of physicians with respect to Deutser's physical and mental condition. Statements alleged to have been made by Deutser to these witnesses with respect to his worry over having met with business reverses were excluded, as being the vaguest sort of hearsay not shown to have been

made with reference to any part of the transactions here in controversy.

 The five following propositions are found to be established law in Maryland, and, so far as applicable to the facts in the present case, are therefore binding upon this court, because the agreement of June 19, 1933, was made in Maryland: (1) The burden of proof rests upon the party alleging fraud. (2) Where a writing, or set of writings, purporting to be a contract, acknowledges receipt of the consideration set forth in the writing, or set of writings, and where the party charging failure to perform never demanded performance, and also charges fraud in that allegedly the consideration was never intended to be given, parol evidence is admissible (a) to show that the consideration was fictitious, and (b) to show what the parties intended the consideration to be. (3) Parol evidence is admissible to show the existence of an oral promise of guaranty, even though such promise could not be enforced because of the statute of frauds. (4) Whether a written promise of guaranty which is a reaffirmance of a previously made oral promise to the same effect be considered separately as a new promise, or merely as a reaffirmance of the old promise, unenforceable because of the statute of frauds, such second written promise is good and enforceable. (5) The giving of something, such as the insurance policies in the present case, by the one who has made the unenforceable oral promise of guaranty, is, in and of itself, sufficient to take the case out of the statute of frauds, because the guaranty then becomes executed rather than executory.

No comment need be made on, nor authorities cited for, the first proposition.

Regarding the second proposition, two cases will be discussed: Southern Street-Railway Advertising Co. v. Metropole Shoe Mfg. Co., 91 Md. 61, 46 A. 513, and Koogle v. Cline, 110 Md. 587, 73 A. 672, 24 L.R.A.(N.S.) 413. In the Southern Street-Railway Case there was a written contract for considerably more street car advertising at a much larger price than the parties had actually agreed upon. The object of the written contract which was executed at the request of the plaintiff, the advertising company, was to impress prospective customers and induce them to pay the higher rate set forth in the written contract. The parties had agreed that they were not to be bound by the written contract. The entire sham contract was discarded and executed performance of the actual agreement was left undisturbed. The actual agreement differed from the sham contract both in respect to the terms of the promise of the defendant and in respect to the terms of the consideration given by the plaintiff. It is true that this case does not present an instance of merely a part, as opposed to the whole, of a set of writings being discarded, because only one writing was involved. Nor was there an opportunity to salvage part of any writing, since it was the established intent of the parties that the whole writing should be legally inoperative. No Maryland case has been found denying the general proposition of the Southern Street Railway Case, to the effect that a contract may be set aside on the basis of parol evidence showing that the intent of the parties was that the contract should have no effect. Plaintiffs admit this exception to the parol evidence rule, but contend that the exception does not apply where part only of a writing is discarded and part saved. The closest parallel in Maryland to the situation where part of a writing has been discarded and part preserved is found in the Koogle Case.

In the Koogle Case, a father purported to convey property to his children for $8,000, receipt of which was acknowledged. Evidence was held admissible to show that the parties never intended the $8,000 to be paid. Here it will be noted the obligation to pay was stricken out of the contract on the basis of parol evidence, whereas that part of the writing dealing with the grant of the property was allowed to stand. Plaintiffs contend that, in the Koogle Case, the deed was a gift, and therefore required no consideration. This begs the question, which is, Can a purported obligation to pay a certain consideration for the purported creation of a right in one's favor be wiped out by parol evidence of the intent of the parties; that is, can the purported creation of the right be shown to be a gift in face of written language to the contrary? To allow the grantee to show no consideration was intended is going further than to allow the grantee to show a substituted consideration. In the present case, the defendant does not seek to show that the purported creation of rights by the note and assignment, or the assignment by itself, was a gift. It seeks to go only to the extent of showing a substituted support for the purported creation of such rights. The Koogle Case lays stress on the fact that

318

there was, as in the case at bar, an acknowledgment of the receipt of the stated consideration. This was taken as some evidence of the fact that the parties never intended the consideration to be performed. In 110 Md. 587, on page 606, 73 A. 672, 679, 24 L.R.A.(N.S.) 413, the court said: "It would seem clear upon principle and authority that the defendants had the right to show that when their father inserted in the deed the consideration of $8,000 paid by the grantees at and before the delivery of the deed, when, in fact, no part of it had been paid, he intended thereby to evidence the understanding of the grantor and grantees that it was not intended to be paid. The effect of such evidence is not to vary or contradict the provisions of the deed, but to explain what would otherwise, on proof that the consideration had not been paid, be a contradiction in its terms. * * * To permit the plaintiffs to contradict the recitals in the deed, and then deny the grantees the right to explain them, would impose upon the latter obligations they never intended to assume, and ought not to be sanctioned in a court of justice."

In the case at bar, not only is the receipt of the consideration duly acknowledged, but fraud is the basis of attack on the assignment and the note. This is an additional reason for liberalizing the strict parol evidence rule. "The existence of fraud at once gives the widest latitude for inquiry by means of which such fraud may be checked and justice done between the parties. * * * Where a deed is assailed for fraud, in that a valuable consideration expressed in it did not pass between the parties, it is competent to show that another valuable consideration existed which was not mentioned in the deed. In the language of a case which supports this view [Leach v. Shelby, 58 Miss. 681], 'the assailant of a conveyance for fraud may show the truth as to its consideration, whatever are its statements. He who is interested to uphold the conveyance is entitled to show the real consideration, in order to maintain it. Truth is the proper object of the investigation, and both parties should stand on the same footing, and have equal opportunity to establish it.'" Jones, Commentaries on The Law of Evidence (2d Ed.) vol. 4, pp. 2871, 2872.

In regard to proposition (3), it need only be pointed out that the statute of frauds bars solely actions to *enforce* a promise to answer for the debt of another unless there is some memorandum in writing. The statute has no relation to the question of evidence introduced to show the *existence* of an oral promise to answer for the debt of another.

The subject-matter of proposition (4) is treated in Robinson v. Hurst, 78 Md. 59, 26 A. 956, 20 L.R.A. 761, 44 Am.St.Rep. 266, and Ingersoll v. Martin, 58 Md. 67, 42 Am.Rep. 322. In the former case, one Faulkner verbally guaranteed a loan made to his firm. Later, after the firm's assignment for benefit of creditors, he wrote the lender that he acknowledged the old obligation arising out of his verbal assurances as to the financial strength of the firm, and that he would assign his insurance policies to the lender as security for his payment of the amount due on the old loan. The new promise to pay was held to be valid, and the lender was allowed to reimburse himself out of the proceeds of the policy. Maryland makes an exception to the strict rules of consideration where a promise is given in "consideration" of a pre-existing moral obligation arising out of an unenforceable promise of guaranty. This is admitted by the plaintiffs in their brief. It would be more accurate to say that a written promise is enforceable where given in place of a verbal promise of guaranty, and the consideration for the new written promise is the same as that for the old verbal, and hence unenforceable promise of guaranty. The situation is very much like that of a promise to pay a debt barred by the statute of limitations. See Williston on Contracts, §§ 149 and 199.

In Ingersoll v. Martin it was held that a pre-existing obligation to pay, unenforceable by operation of law, forms sufficient "consideration" to support a promise. The particular pre-existing obligation involved in that case was, however, held to be insufficient to support a new promise because it had voluntarily been released by the creditor under seal and was not of the type involved in the case at bar; that is, one unenforceable by operation of law.

Turning now to the fifth proposition, its applicability is predicated on the possibility of construing the assignment of the insurance policies as a giving of something in settlement of the old White House obligation rather than as a giving of security for the note. In other words, it may be said that the assignment was not subordi-

nate to the note but co-ordinate with the note, with both the note and the assignment being given in place of, and in discharge of, the old White House debt. Under this interpretation, it is not necessary to say that Marlboro became entitled under the assignment to the full value of the policies; as the assignment was limited by the clause "as the interest of the assignee may appear." This clause does not prevent the assignment from being executed. It merely limits the extent of the interest assigned. The assignment being executed, the statute of frauds becomes immaterial.

Under this interpretation of the facts, the case at bar is brought substantially within the facts of Webster v. LeCompte, 74 Md. 249, 22 A. 232. There, suit was brought by Webster's firm for the value of fertilizer delivered to defendant's testator. Webster's son had owed money to the defendant's testator on a note, amounting to $500. The son became insolvent, and Webster agreed to deliver the fertilizer to pay for his son's debt. Oral testimony was held admissible to explain the true nature of the transaction since it had been executed.

■ Deutser, upon payment of the White House debt to Marlboro with the transfer of the $4,540.25 interest in the insurance policies to Marlboro, became subrogated to Marlboro's rights against White House. Hence Deutser became entitled to have the dividends from the bankruptcy proceedings of White House credited against the $4,540.25. These dividends totaled $432.36, thus leaving a balance of $4,107.89 as the net amount of Marlboro's interest in the policies.

Applying the five propositions just discussed to the facts in the present case, it follows that the defendant must prevail if the proof clearly and satisfactorily supports defendant's contention. What the defendant claims is that there has been a mistake of law, namely, that the written agreement fails to express the intention of the parties because of a mutual mistake as to the legal effect of the words employed in the agreement if taken literally, though there has been no misapprehension as to what words have been used. If this be in fact the case, reformation should be allowed, provided the proof is clear and satisfactory. See Williston on Contracts, §§ 1585 and 1586, and cases cited. Passing, then, to the test as to the quantum and character of proof where reformation is sought for such mistake, the rule is thus stated by Williston:

"Though equity will not permit the parol evidence rule to prevent it from granting relief for mistake, 'the purpose of a written contract is to furnish a record of the terms of the agreement of the parties not easily impeached, and thereby to avoid subsequent disputes and conflicting testimony and claims regarding its terms and their meaning. To accomplish this purpose, and to prevent such disputes from annulling written agreements, two rules have been firmly established in equity: First, that the burden is on the complainant to prove the mutual mistake, or the mistake of one party and the deceit, fraud, or inequitable conduct of the other, upon which he relies for a modification or avoidance of the contract; and, second, that in view of the written record of the terms of the agreement made at the time a preponderance of the evidence is insufficient, and nothing less than evidence that is plain and convincing beyond reasonable controversy will constitute such proof as will warrant a modification or reformation of a written agreement.' [Bailey v. Lisle Mfg. Co. (C.C.A.) 238 F. 257, 266].

"Though it is settled that there must be more than a mere preponderance of evidence in order to justify relief in equity from mistake in a written instrument, the language of different courts varies in regard to the quantum of evidence necessary to sustain the burden of proof thrown upon one who seeks relief. In many cases it is said that proof must be beyond a reasonable doubt, that this mode of expression has been criticized, and the better and commoner way of appraising the quantum of proof is to state that the evidence must be clear and satisfactory or words of similar effect." Williston on Contracts, § 1597.

■ In other words, the party seeking to vary a written contract for mistake—Marlboro in the present case—has the burden of proving the mistake by clear and convincing evidence. However, there is a counter burden on the plaintiffs to establish fraud arising out of their claim that Marlboro never intended to perform; that is, to deliver the shirts. Extrinsic evidence is necessary in order to establish the intention never to perform, and extrinsic evidence is likewise admissible to deny the existence of such intention. By extrinsic

evidence is meant evidence other than the writings of June 19th. The plaintiffs' case of fraud hinges on establishing the intention of Marlboro not to perform. Otherwise plaintiffs would have only an action at law for damages for breach of contract, a right which they have never claimed.

The evidence which supports defendant's contention may be summarized as follows: (1) The similarity between the figures in the purported contract of June 19th and the amount of the old debt; (2) the anomalous or prima facie fictitious character of the voucher supporting the figures in the purported contract; (3) the oral testimony of the officials of the defendant company that they, as well as Deutser, intended, when the writings were being prepared and signed, that they were to cover the old indebtedness; (4) oral testimony by officers of defendant company denying that any demand was made by Deutser upon the plaintiffs for delivery of the shirts stated as consideration in the agreement of June 19th, thus further corroborating the inference that neither party to the agreement ever intended the shirts. to be delivered, plaintiff having produced no credible evidence to show that there was such a demand; (5) the statement in the letter of the insured of May 20, 1933, that his new store would not be ready until September and that he would prefer to start with fall merchandise; (6) the acknowledgment in the agreement of June 19, 1933, and by separate document bearing the same date, of the receipt of the stated consideration; and (7) the predisposition of the deceased to resort to fictions, as evidenced by his telegram to Mr. Rosenbloom, secretary and treasurer of defendant company, requesting assistance in "bluffing" the rental agent in Houston in order to obtain reduced rental of his new store.

We are not unmindful of the fact that (1) there is no reference whatsoever in the writings of June 19th to any guaranty; (2) that there is no direct evidence whatsoever of any kind, oral or written, by or on behalf of the insured, that he ever guaranteed, in any form, the old indebtedness; (3) that there is no evidence of any kind whatsoever, oral or written, by any one who was present as his representative, as

to what his intention was at the time the written contract was prepared and signed, all evidence of such intention being confined to the oral testimony of the officials of the defendant company, one of whom drew the contract and the other requested that his associate draw it; and to the circumstantial evidence above referred to.

We are equally aware of the fact that in no case which we have found, or to which we have been referred, is the nature of the evidence precisely parallel to the nature of the evidence in the present case, with respect to the true intent of the parties. For instance, in Koogle v. Cline, there was testimony by the attorney of the party sought to be bound; that is, the deceased grantor. In Robinson v. Hurst, there was reference in a letter—incomplete it is true—to the prior unenforceable oral obligation, which was adopted as support for the new obligation set forth in the letter. In the present case, there is no testimony of a representative of Deutser such as is found in the Koogle Case; yet in the Koogle Case there was no written evidence from which the grantor's intent could be inferred except the receipt for the stated consideration. There is no parallel in the Koogle Case for other corroborating written evidence found in the present case and summarized directly above. Similarly, in Robinson v. Hurst, while it is true there was written reference to the old debt, that reference was incomplete and hardly more convincing than the combined written evidence in the present case, particularly when the written evidence is explained by the parol.

Therefore, summarizing our conclusions, we believe that the defendant has developed a consistent and plausible story of what took place, whereas plaintiffs have produced no counterbalancing evidence in denial, and have thus failed to sustain their burden of proving fraud. Accordingly, the motions by the defendant to dismiss the amended answers and cross-bills in both cases must be granted, and the defendant is entitled to a decree for payment of $4,-107.89 and interest out of the money deposited in court by the insurance companies. Interest will be allowed on this sum from June 19, 1933, to the date of the decree.